# THE MAYOR AND CITY COUNCIL OF BALTIMORE *vs.* THE BALTIMORE AND PHILADELPHIA STEAMBOAT COMPANY—THE SAME *vs.* MAYOR AND CITY COUNCIL OF BALTIMORE.

*Riparian Rights of Owners of Wharves in the Harbor of Baltimore City—Construction of Acts of Assembly—Condemnation of Part of a Wharf to Widen a Street—Concurrent Rights in Water of Harbor of the Owners of Wharves at Intersecting Points—Permit to Build Pier out from Wharf—Award of Damages on Condemnation.*

Pratt Street, extending along the north side of navigable water in the harbor of Baltimore City, called at that point the basin, is intersected at right angles by Light street, which extends southerly along the west side of said water. The riparian owners along these streets had filled out into the water and built wharves under the provisions of the Acts of 1745, ch. 9; 1796, ch. 45; 1801, ch. 92, and 1805, ch. 94, or some of them, by which they acquired the perpetual right to use the wharves and were exclusively entitled to the right of wharfage and moorage. In 1817, Pratt street was condemned by the city, which thereby became owner of the wharf extending easterly on said street from Light street, and entitled to riparian rights as such owner. A steamboat company became the owner of six contiguous lots on Light street running south from Pratt street and of the wharves, fourteen feet wide, built out into the water from the same, and that company was also the lessee of the city's wharf on Pratt street to the north thereof. The steamboat company, under permits from the city, built out piers projecting from its wharves into the basin. In 1904, the city, acting under an ordinance of that year, and under the Act of 1904, ch. 87, for the purpose of widening Pratt street, condemned a strip of land south of

that street fifty feet wide and extending several hundred feet easterly from Light street. The property condemned included fifty feet of the wharf owned by the steamboat company, and a part of the pier. Upon appeal from the award of damages and benefits, *held.*

That the steamboat company, as the successor in title of the owners of lots on Light street who had filled them out in accordance with said Acts of Assembly, had an irrevocable right to maintain said wharves and to the rights of wharfage and moorage in connection therewith, and cannot be deprived of these rights except upon compensation after due condemnation.

That the steamboat company is not estopped from asserting its rights to the Light street wharves from the fact that it is the lessee from the city of the Pratt street wharf immediately to the north thereof.

That the right of the steamboat company to the piers built out into the basin in front of its wharves, depends upon the terms of the permits from the city under which they were constructed, and these permits do not show an intention to give the steamboat company any right to use the waters of the basin superior to the right of the public to use the Pratt street wharf.

That the Acts of 1796, 1801 and 1805, which authorize the extension of the Light street lots by filling in and building out the wharves, did not grant to the owners of those lots any rights in the basin superior to, or exclusive of, those possessed by the owners of land bounding on the basin to the north, who had filled out their land and constructed wharves under the Act of 1745.

That by these Acts, the Legislature granted to the owners of wharves on Light street and Pratt street, concurrent rights to the navigable waters of the basin lying in front of their wharves.

That in estimating the damages to the steamboat company caused by the taking of part of its wharf and pier, all of the advantages and disadvantages caused thereby, must be taken into consideration, as is required by the Act of 1904, and it appears from the inquisition that such allowance of damages was made, and it is not shown that damages were allowed for a portion only of the improvements on the condemned part of the property.

That the record does not present any question as to the priority of one of several deeds from the State after the passage of the Act of 1745.

That the city, as the owner of the wharf on the south side of Pratt street as widened, will have the same wharfage and riparian rights in the water in front, which it had in front of its wharf before the widening.

That the steamboat company is entitled to damages for the condemned portion of its Light street wharf and improvements, and the loss of its right to moor and dock vessels on the fifty feet part of its wharf taken for the widening of the street, and the deprivation of the right of ac-

cess by water over those fifty feet, and the extinguishment of its lease of the Pratt street wharf; and that the city is entitled to only nominal damages, because it will have the same wharfage and riparian rights on the south side of the widened street that it now has on the south side of the present street.

*Decided December 19th, 1906.*

Cross-appeals from Baltimore City Court (STOCKBRIDGE, J.)

The cause was argued before McSHERRY, C. J., BOYD, PEARCE, SCHMUCKER, JONES and BURKE, JJ.

*Edgar Allan Poe, Deputy City Solicitor,* and *Joseph S. Goldsmith, Assistant City Solicitor,* (with whom was *W. Cabell Bruce, City Solicitor,* on the brief), for the city of Baltimore.

*Richard M. Venable* and *T. F. Cadwalader,* for the Steamboat Company.

SCHMUCKER, J., delivered the opinion of the Court.

The cross-appeals in this case are from the rulings and inquisition of the Baltimore City Court on appeals taken to that tribunal from an award of the Burnt District Commission of Baltimore City. The award made by the commission was of damages and benefits for the widening of Pratt street eastwardly from its intersection with Light street. Those two streets intersect each other at what is practically a right angle. The wharf running along the south side of Pratt street abuts on the north side of the navigable waters of the basin, and the wharf running along the east side of Light street abuts on the west side of the same waters. The most important questions with which we have to deal relate to the respective water rights of the city of Baltimore as the owner of Pratt street and wharf and the Baltimore and Philadelphia Steamboat Company as the owner or lessee of a portion of the Light street wharf.

All of the land involved in the present controversy including the beds of the two streets, was originally covered by the waters of the basin and has been filled up from the north and

west by the proprietors of adjacent lands under the provisions of the Acts of 1745, ch. 9; 1796, ch. 45; 1801, ch. 92; 1805, ch. 94, or some of them. These Acts have been construed by this Court in *Page* v. *Baltimore*, 34 Md. 558; *Hazlehurst* v. *Baltimore*, 37 Md. 199; *Horner* v. *Pleasants*, 66 Md. 475; *Tome Institute* v. *Crothers*, 87 Md. 584, and other cases, and it will not be necessary for us to refer at length to their provisions. Such portions of them as bear specially upon features of the present case will be noticed hereafter.

The portion of Pratt street with which we are concerned was condemned and opened of its present width of 70 feet under the Act of 1817, ch. 71, as a highway and public wharf and substantial damages were awarded and paid to the owners of the land taken under the condemnation. The city thus acquired the wharf and riparian rights of the former owners of the land abutting on the north side of the basin.

The Steamboat Company is the owner or lessee of contiguous lots on the west side of Light street having an aggregate front, extending from Pratt street southerly, of about 151 feet. As appurtenant to each one of these lots the company also owns the wharf lying opposite it on the east side of Light street. The wharf extends back from the water 14 feet so that the Steamboat Company has on the east side of Light street contiguous wharves 14 feet deep with an aggregate front on the basin of about 151 feet. In front of these wharves the company has, under various permits from the city, constructed out over the water what is practically a continuous pier, projecting from the east side of Light street into the basin eleven and a half feet at its north end, aud one hundred and seven feet ten inches at its south end and having a diagonal water front on its east side of one hundred and eighty-four feet, five inches. The Steamboat Company is also the lessee from the city, at an annual rent of $3,600, of a portion of the wharf on the south side of Pratt street extending 200 feet easterly from tthe corner of Light and Pratt streets.

The general situation at the southeast corner of Pratt and Light streets being such as we have mentioned the Burnt Dis-

trict Commission, acting under ch. 87 of the Acts of 1904 and Ordinance No. 66 of 1904, of Baltimore City, undertook to add fifty feet to the width of Pratt street easterly from its intersection with Light street.   In the process of widening the street the commissioners condemned a strip of land fifty feet wide by three hundred and fifty-eight feet long lying immediately south of the original Pratt street.   They divided this strip of land into three lots, designated A B & C, for which they awarded damages.   They at the same time assessed benefits upon three other lots, one lying in the basin immediately south of lots A & B, and designated No. 312, the other two lying on the east side of Light street designated Nos. 313 and 314.   All six of these lots were at the time covered by the navigable waters of the basin with the exception of a strip of the Light street wharf 50 feet, one and a half inches long by 14 feet wide, but over Lots 313 and 314 and Lot A were erected the piers, already referred to, owned or leased by the Steamboat Company.   A nnmber of plats appear in the record which do not entirely agree in their lines but the following plat, made up from those filed by the commissioners with their return, designates the location and dimensions of the lots in question with sufficient accuracy for the purposes of this opinion.

*Light St.*

Wharf

25', 9"  24', 6"  31', 9"  24', 7"  24', 6"  21', 3"

50', 1½"

107', 10"

33'

32'

36', 9"

No. 314

47'

36', 3

No. 313

24', 9"

10', 6"

A

B

A

No. 312

208' 7"

N

*Pratt St.*

*Basin*

No. 311

150'

C

No. 310

187', 6"

D

The commissioners awarded $17,531.25 damages to the city and the Steamboat Company for Lot A, which includes the strip fifty feet, one and a half inches long by fourteen feet wide of Light street wharf owned by the company together with the pier built out from it into the basin and also the pier along the south side of Pratt street leased by the company from the city.   They awarded $30,000 damages to the city for Lot B, which includes enough of the basin to make in connection with Lot A sufficient area to widen Pratt street fifty feet for the distance of two hundred and eight feet, seven inches easterly from Light street.   They awarded $15,000 damages to the State of Maryland for Lot C, lying east of Lots A & B and including enough of the basin to extend the widening of Pratt street for an additional one hundred and fifty feet easterly.   They assessed $5 benefits to the city on Lot No. 312 lying in the basin immediately south of Lot B, and they assessed $658 and $885, respectively, benefits to the Steamboat Company on Lots Nos. 313 and 314, which lie in succession along the east side of Light street south of Lot A, and include a large portion of the wharf and pier of the Steamboat Company there being.

Both the city and the Steamboat Company excepted to the awards and appealed to the Baltimore City Court, where the case was tried without a jury before STOCKBRIDGE, J., who by his inquisition filed in that Court allowed damages to the Steamboat Company for the value of the condemned portion of its Light street wharf and the improvements thereon and the loss of its right to moor and dock vessels on any part of the fifty feet taken for the widening of the street and the deprivation of the right of access by water over those fifty feet, and the extinquishment of its lease of the Pratt street wharf and the improvements thereon, damages aggregatieg $28,162.50, and assessed nothing against it for benefits to accrue to the portion of its property not taken under the condemnation. He allowed the city only the nominal damages of $5, because he held that it will have the same wharfage and riparian rights to the south side of the widened Pratt street and the water in

front of it that it now has to the south side of the present street
and the water in front of it.    The city and the Steamboat Com-
pany thereupon took the present cross-appeals from the rulings
and inquisition of the City Court.

At the hearing in the Court below the Steamboat Company
offered eight prayers of which the 1st, 2nd, 4th, 5th and 7th
were granted and the other three were rejected.  The city
offered no prayers.    As both sides appealed we will review all
of the rulings on the prayers, and in so doing will dispose of
all of the questions presented by the record.

The first prayer simply asserts that the owners of the lots
on the west side of Light street who filled out their land to
the east side of that street according to the provisions of the
Acts of 1796, 1801 and 1805, acquired thereby the right to
maintain wharves and load and unload vessels from and on
them and to moor vessels to them and to dock them; in the
waters of the basin on the east, to their respective wharves.
As this prayer does not claim for the owners of the wharves
any sole, exclusive or superior right to the use and occupancy
of the waters of the basin, it was properly granted under the
authority of the cases of Page, Hazelhurst and Horner, *supra*,
in which it was held that although that the owners who had so
filled out their land did not thereby acquire a technical fee in it
they did acquire a perpetual use of it for the purpose of erect-
ing and maintaining the wharves, which is defined in Horner's
case as a license or franchise, which, so long as it is used,
the State can no more annul than she could a patent in fee.

The second prayer asserts that the Steamboat Company is
the owner of the "property and rights" conveyed to it by cer-
tain enumerated deeds under which it claims title to its Light
street lots and wharves.    That prayer was properly granted.

The fourth prayer is really a corollary to the second and
asserts that neither the owners of the lots on the west side of
Light street who had filled them out in accordance with the
Acts of Assembly mentioned, nor their successors in title
could be deprived of their wharfage rights and privileges, with-
out their consent, by the State or the city except by condem-

nation under the power of eminent domain.    That prayer also
was properly granted.

The seventh prayer declares that the Steamboat Company
is not estopped, by the lease from the city to it of the Pratt
street wharf, from asserting in this case any right it may have
to moor and dock vessels in the dock lying south of that
wharf.   We think that prayer was properly granted.   This is
not a case between landlord and tenant as such nor one call-
ing in question, in behalf of one of them against the other, their
respective rights under their lease.   It is a proceeding *in rem*
to condemn all property rights of every kind in the area nec-
essary to be taken for widening Pratt street.   The Steamboat
Company claims certain rights in this property, *i. e.*, in the
basin, as incident to its ownership of the Light street wharf
and other rights as lessee of the Pratt street wharf.   All that
the prayer does is to say that the company is not estopped by
its lease of the Pratt street wharf from asserting any rights in
the waters of the basin which it may have as an incident of its
ownership of the Light street wharf.

The fifth prayer asserts that the Steamboat Company is en-
titled to the use of such wharves and the land under them as
the Court shall find that it extended into the basin under per-
mits from the city, subject to the limitations or restrictions
contained in the permits or imposed by law.   The propositions
embodied in this prayer are, when fully stated and properly
understood, correct.   Any right of the Steamboat Company to
extend piers into the basin in front of its Light street wharves
under permits from the city is of course subject to the limita-
tions and restrictions, if any, imposed by the permit under
which the right is claimed.   It is equally clear that all such
rights are subject to the limitations and restrictions imposed
by law including those imposed by law upon the city's power
to grant the permit or inherent in the nature of its title to the
navigable waters into or over which the structure designated
in the permit is intended to be built.   The title and power of
the city in relation to such waters being derived from the State
cannot be greater than those of the State itself.   It is well

settled.that, although the State is said to be the owner of the navigable waters within its boundaries, it holds them, not absolutely, but as a *quasi trustee* for the public benefit and to support the rights of navigation and fishery to which the entire public are entitled therein, and, although the State can make a valid grant of privileges or interests in or over those waters, such grants are subject to the public rights of navigation and fishery. *Browne* v. *Kennedy,* 5 H. & J. 196; *Wilson* v. *Inloes,* 11 G. & J. 359; *Phipps* v. *State,* 22 Md. 389; *Dundalk, &c., R. R. Co.* v. *Smith,* 97 Md. 180; *Woodworth* v. *N. Bloomfield & Co.,* 18 F. R. 778; *Newark Aqueduct Board* v. *Passaic,* 45 N. J. Eq. 393. It is a familiar principle of the common law, which was recognized and in part relied on by us in the Dundalk R. R. Co's. case, that in a grant from the State nothing passes by implication but the grantee takes only that which is given him by express terms. For a long time previous to the granting of the permits referred to in this prayer there had been a public wharf along the south side of Pratt street east of Light street to which vessels navigating the basin were entitled to be moored and docked under such reasonable regulations as the city might from time to time adopt. There is no express provision in the permits in question indicating that it was the intention of the city in granting them to confer upon the grantee an interest in the waters of the basin inconsistent with or superior to the right of the public to the use of the basin in front of the Pratt street wharf, and no such intention should be implied from the grant. The fact appearing from the record that the city from time to time made leases from year to year of portions of the Pratt street wharf to individuals or corporations does not alter the principles applicable to the situation.

We will now turn our attention to the rejected prayers. The third prayer asserts the proposition that any rights which the city has by virtue of the condemnation of Pratt street as a public street and wharf under the Act of 1817 to moor and dock vessels along the south side of that street easterly from Light street are subordinate to the rights of the Steamboat

Company as the successor of the owners of the lots mentioned
in the first prayer, and that the city can only use its rights in
that connection to such an extent as will not encroach upon
or interrupt the user of the rights of the company. That
prayer was properly rejected. The record affords no sufficient
foundation on which to base the proposition asserted in the
prayer.

The contention of the Steamboat Company is that by the
Acts of 1796, 1801 and 1805, which authorized the extension
of the lots at the west end of the basin, eastwardly to the east
side of Light street, the State undertook to grant to its prede-
cessors in title exclusive "wharfage rights and privileges" in
the navigable waters of the basin lying in front of the east side
of Light street, and that therefore when the State or its agent
the city thereafter in 1817, by the condemnation of Pratt street
and wharf, acquired the riparian land to the north of those
waters it was estopped from claiming any rights superior to or
inconsistent with those granted by the earlier Acts of 1796, 1801
and 1805. That contention involves the concession that the
Legislature by the passage of the last mentioned Acts *intended*
to grant to the owners of the Light street lots rights in the
basin *superior* to or *exclusive* of those vested in the owners of
the land bounding those waters on the north.

In order to ascertain the true intention of the Legislature in
the passage of those Acts we must look to the then existing
condition and situation of the property and rights upon which
they were intended to operate and the general principles of law
applicable to the field of legislation to which the Acts belong.
When those Acts were passed the Act of 1745, authorizing the
owners of land fronting on the basin to extend their land into
the water by filling in or improving out, was in full force. This
Court in construing that Act in *B. & O. R. R.* v. *Chase*, 43
Md. 36, said that it "was intended to encourage improvements
on the water fronts of the harbor of Baltimore, for the conven-
ience and accommodation of commerce; and as an induce-
ment, the State agreed with and did thereby surrender to those
improving, as contemplated by the Act, all its right as sover-

eign in the shore of the river covered by such improvements below the ordinary water mark and declared that such improvements should be forever deemed the right, title and inheritance of such improvers, their heirs and assigns forever. By the construction of this Act, as settled by the decisions of our predecessors, the right of the lot owner fronting on the water to extend his lot or improve out to the limit prescribed by the authorities of the city is a franchise, a vested right peculiar in its nature but a *quasi* property of which the lot owner cannot be deprived without his consent."

It appears from a copy, found in the record, of the original plat of Baltimore Town laid out in 1729, that Lot No. 45 lay on the east side of Light street north of the basin, the south side of the lot abutting on the basin. It further appears from the city's abstract of title contained in the record that in 1789, Harry Dorsey Gough conveyed to John Ellicott a lot of ground extending southwardly from Lot 45 to the water reciting that the lot so conveyed had been made and raised out of the water. In 1795 John Ellicott and others conveyed to Benjamin Rich 18 lots said to have been made and raised out of the water, south of and adjoining the ground conveyed in 1789 by Gough to Ellicott. Lot 18 which was then improved by a warehouse was reconveyed by Benjamin Rich to John Ellicott and others on June 6th, 1795. It appears from the description of this lot No. 18 and the proceedings for the opening of Pratt street in 1817 that the lot lay on the east side of Light street and extended southerly to within four feet of the present south side of Pratt street where it met the water.

It thus appears that at the date of the passage of the Act of 1796, which is the earliest in date of those relied on by the Steamboat Company, the land lying north of the basin immediately east of Light street had been extended southwardly by filling in to within a few feet of the present north side of the basin. That land was entitled to riparian rights to the same extent as the other land abutting on the basin.

It would be a violent assumption to hold that the Legislature, with such a state of facts before it, intended, if it could

have done so, by the passage of the Acts of 1796, 1801 and
1805, to deprive the owners of lots, already filled up to the
north of the basin, of their riparian rights in favor of the own-
ers of the lots lying west of the basin who were by those Acts
authorized to thereafter fill out their lots to the east side of
Light street where they would also bound on the basin.

In *Hazlehurst's case, supra,* this Court in considering what por-
tion of the made land constituting the bed of Light street which
the Acts of 1801 and 1805, provided should be a highway for-
ever, might be used by the owners of the wharves on its east
side for the purpose of handling and protecting the freight
shipped and received over their wharves, held that, in view of
the purposes of the Acts of 1796, &c., relating to that street,
the grant and reservation of wharfage rights and privileges
thereby made should not receive a narrow construction against
the owners in favor of the highway. In that case however the
Court had in view and referred to the use of the bed of Light
street and neither considered nor passed upon the question of
the respective or conflicting rights of the owners of the
wharves on the north and west sides of the basin to use or oc-
cupy its navigable waters. Nor do we think, in view of what
we have said, that the provision in the Act of 1805, that the
persons who should fill up and wharf out to the east side of
Light street under its provisions should "be solely and exclu-
sively entitled to the emoluments arising from the wharfage
upon such improvements," should receive such a construction
as would override or destroy the riparian and wharfage rights
of the persons who under the Act of 1745 had filled out their
land southwardly to the present north boundary of the basin.
The word wharfage is usually and ordinarily employed to des-
ignate the charge made for the use of a wharf for the purpose
of loading or unloading freight on or from vessels lying by its
side. The mere fact that the same word is sometimes used
synonymously with dockage or moorage to describe the
charge made by the owner of a dock or basin for the privilege
of allowing a vessel to lie there, does not in our judgment un-
der the circumstances of this case afford sufficient foundation

for implying from the Acts of Assembly under consideration an intention to grant to the private persons who filled out their lots to the line of the east side of Light street exclusive rights of use or occupancy of the navigable waters of the basin lying beyond that line.

The rational and just construction of all the Acts of Assembly to which we have referred considered as a body of enactments relating to the rights of the owners of lands bounding on the basin requires us to hold that the Legislature by their passage intended to and did grant to the owners of the wharves on Light and Pratt streets concurrent rights to the use of the navigable waters of the basin lying in front of those wharves.

It is to be observed that the question before us is not that of the right of riparian owers *to wharf out to the deep water line*, which under the authorities must be exercised within side lines at right angles to a straight shore or if the shore be concave within converging side lines which proportionately divide the tide water shore among such owners.   The question is as to the respective rights of riparian owners, who have already wharved out to the navigable water, to use the portion of such waters lying in front of their wharves, a right which must be exercised and enjoyed with due regard to the rights of other similarly situated to use the same waters.   Nor does the record before us present a case dependent upon the relative priority of one of several deeds from the State after the passage of the Act of 1745, such as the issue considered and determined in *B. & O. R. R.* v. *Chase, supra.*   Here it does not appear which of the contestants claims under a prior grant from the State and it does appear that the grants from the State for all of the land affected by the controversy were made prior to 1745.  It appears from the record that the title to the land lying north of the basin was derived from Charles Carroll, the common grantor, by a deed executed in 1730 and the land on the west of the basin was not conveyed by him to the persons under whom the Steamboat Company claims title until 1782 so that, in that sense, the city claims under a prior grant.

But.as the deed from Carroll of 1730, under which the city claims was made prior to the passage of the Act of 1745 no such presumptions arise in its favor against those claiming under the deed of 1782 as were held to arise in *B. & O. R. R.* v. *Chase*, in favor of those claiming in that case under the prior deed from the State executed after the Act of 1745 went into force.

The sixth prayer asserts that, in determining the damages to which the Steamboat Company is entitled, the Court should take into consideration any injury which it should find from the evidence to any remaining part of the wharf and dockage rights of the company that are not being condemned in this proceeding. In support of this prayer the company relies not only upon the contention that it is legally entitled to an allowance, in this proceeding, for consequential damages but also upon the language used in secs. 8 and 9, ch. 87, of the Act of 1904, under which the present proceedings are being conducted. Sec. 8 requires the commission whenever it shall become necessary to exercise the powers of condemnation conferred on it to "ascertain whether any and what amount in value of damage will thereby be caused to the owner of any right or interest in any ground or improvement within said Burnt District for which, taking into consideration all advantages and disadvantages, such owner ought to be compensated." Sec. 9 of the Act provides that "when in the judgment of the commission a part of the whole of the improvements of any lot can be taken without destroying the whole of said lot or said improvement for the purposes for which the lot or improvement are used, or for building purposes the said commission shall only condemn such part of said whole lot or improvements as is necessary for the proposed object and shall award to the owner or owners of the part, of the lot, or improvements so taken such damages and assess upon the remainder thereof such benefit as in their judgment shall be right and proper."

Even if we construe, as we think we should, the expression "any right or interest in any ground or improvement" used in sec. 8 to refer only to such ground or improvements as are

taken in the condemnation, the section still requires that, in estimating the damages for the taking, all of the advantages and disadvantages caused thereby should receive due consideration.   This provision of the Act fixes a somewhat different measure of damages for the taking of property from its mere market value, as has been done by other Acts of Assembly authorizing condemnations of land ·for public purposes.   In *Shipley* v. *B. & P. R. R.*, 34 Md. 336, a somewhat similar provision in the law authorizing the condemnation of land and other property for the purposes of the railroad was determined to be constitutional and held to authorize the jury "to estimate in the first instance and as an essential and primary element of damages the actual value of the land or property proposed to be taken and then to consider what other and incidental damages will result to the owner by reason of the use and occupation thereof for the purposes of the road" and then to set off against them the benefits or advantages to accrue to the owner by the construction of the road.   The advantages and disadvantages to be considered under such a statute must of course depend upon the circumstances of each case and a prayer invoking the benefit of the statute should not be general in its terms but should direct the attention of the jury to the facts and circumstances which, if found by them from the evidence, should be taken into consideration as advantages or disadvantages in determining the amount of damages.   The learned Judge below rejected the prayer now under consideration, but, apart from the fact that the prayer was very general in its terms, the Steamboat Company suffered no injury from its rejection because it appears from the enumeration of the different elements of damage, appearing in the inquisition filed by him in the Circuit Court, that in estimating the damages which the company suffered from the condemnation he had regard to all of the elements of advantage and disadvantage proper to be considered in the case.

It appears from the inquisition, that, although there was nothing allowed to the company for the loss of emoluments to arise from wharfage in the strict sense of that term because

there was no evidence in the record that there had been any receipts from that source, its right to dock or moor vessels in front of the portion of its wharf taken by the condemnation was treated as "a distinctly valuable right" and compensation was allowed for the loss of that right.   The Steamboat Company contended on its brief and in the argument that the Court below also erred in allowing it nothing for "loss of improvements erected on Light street in the exercise of its franchise."   There is a distinct allowance in the inquisition of $1,500 "for the improvements erected upon the wharf on the Light street franchise," but because in an earlier part of the inquisition the Court described "the wharf franchise acquired by Calhoun" by filling out his lots as being "in a lot 14 by 50 feet 1 ½ inches," the company contends that the allowance for improvements on the Light street franchise must be applied only to the portion of its Light street franchise which it claims under Calhoun and not to the improvements on the piers extended out under permits from the city.   It being admitted that the improvements on the company's Light street property consisted of practically continuous frame structures or sheds, it is not to be presumed, in the absence of very specific statements to that effect, that the learned Judge below intended by his inquisition to allow damages for a portion only of the improvements on the condemned part of the property and to exclude from his consideration the remainder of these improvements.

Copies of two resolutions of the Mayor and City Council of Baltimore authorizing the issue of permits to extend the Light street wharves, into the part of the basin condemned in this proceeding, appear in the record. The first, passed June 8th, 1852, authorizes the extension of the wharf, from a point 22 feet from Pratt street southerly 45 feet on Light street, 22 feet into the basin.   This permit is on its face revocable at any time on twelve months notice by the city.   The second, passed June 2nd, 1866, permits a triangular extension, of which the length on Light street is not stated, at the southeast corner of Light and Pratt streets.   This permit was on

its face revocable on six months notice by the city, and the record states that such notice has in fact been given by the .city.   The interests therefore of the company in the extension of its wharf into the condemned part of the basin must have ·been but temporary in its nature.

Another ground of objection, urged by the Steamboat Company to the action of the Court below, is that nothing was allowed by way of consequential damages for the injury caused by the condemnation to the portion of its property not taken.   Assuming without so deciding, that, under the language found in secs. 8 and 9 of the Act of 1904, creating the Burnt District Commission, to which reference has already been made, it was the duty of the Court to take into consideration in making its awards the collateral effect of the condemnation of part of a lot upon the remaining portion of the property and award damages or benefits therefor according to its conclusion as to whether the condemnation had proven injurious or beneficial, the record shows that the Court has done so in the present case.   The award of the commission assessed against the Steamboat Company benefits amounting to $1,443, in all for the effect of the condemnation on its remaining property lying south of the condemned lot.   The Circuit Court considered and passed upon that question and struck out the assessment of benefits and thereby improved the result to the company by the amount of those benefits. We do not pass upon the amount of damages or benefits awarded but upon the legal proposition involved in the action of the Court below.

The eighth prayer asked the Court to rule that there was no legally sufficient evidence that the city had ever asserted any claim to any right to dock and moor vessels in the dock immediately east of Light street and immediately south of Pratt street, which would interfere or conflict with any such right the Court may find that the Steamboat Company had.   That prayer was properly rejected.   In the first place the question at issue was not the assertion but the possession of the right.   In the second place the Steamboat Company

itself had for many years past been in possession and use of the waters of the portion of the dock referred to in the prayer as tenant from year to year of the city. We have held that lease did not estop the company from asserting any rights it had, as appurtenant to its Light street wharf, in the leased part of the dock. Neither did the lease estop the city from asserting any rights it had as appurtenant to its Pratt street wharf in that part of the dock.

We think the learned Judge below properly held that the city will have the same wharfage and riparian rights to the navigable water in front of the south side of the widened Pratt street which she has to that in front of same side of the street in its present location. If the Steamboat Company is permitted to retain *in situ* the extension of its Light street wharf authorized by the ordinance of June 8th, 1852, the city's water front on the south side of Pratt street will be somewhat shortened, but as the city has the right at any time under the terms of that ordinance, to require upon twelve months notice the removal of that extension, it can relieve itself of that situation at any time.

The permits for the extension into the basin of its wharves south of the portion covered by the ordinance of 1852 do not appear in the record. For that reason and for the further reason that that part of the extension is not involved in the present controversy we express no opinion as to the nature of the tenure by which it is held by the company.

Finding no error in the rulings of the Court below on the prayers or in the inquisition they will be affirmed.

> *Rulings and inquisition affirmed with*
> *costs, in both cases.*