## TRAFIKAKTIEBOLAGET GRANGESBERG OKELOSUND v. WILKENS et al.

(District Court, S. D. Texas, at Galveston. March 18, 1925.)

No. 1226.

1. **Shipping ☞50—Liability of charterer for port charges under charter party.**

A provision of a charter party requiring the charterer, for a consideration paid to pay

4 F.(2d)—37

"port charges at loading ports on outward cargo, viz. tonnage dues, custom house fees, levee dues, quarantine fees, and cost of fumigating, wharfage, watching, and outward pilotage," *held* to limit the liability of the charterer to the items enumerated.

2. **Shipping ☞50—Provision of charter party for payment of pilotage construed.**

A requirement of a charter party that the charterer should pay outward pilotage "at loading ports" *held* not limited to pilotage, when the vessel was outward bound from the last port of loading, but to include all pilotage outgoing after any part of the cargo had been laden.

3. **Shipping ☞50—Charter; port charges.**

A provision giving the charterer the right to load at two ports, by paying all extra port charges at the second port, covers all customary charges at such port, made in connection with the entry of the ship, securing and loading cargo, and departure of the ship from port.

4. **Shipping ☞50—"Wharfage."**

An agreement by a charterer to pay "wharfage" includes "dockage" charged for use of a wharf, whether merely as a berth or for loading purposes.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Wharfage.]

In Admiralty. Suit by the Trafikaktiebolaget Grangesberg Okelosund against R. B. Wilkens and Carl C. Biehl. Decree for libelant for part of claim.

Lockhart, Hughes, Lockhart & Rayzor, of Galveston, Tex., for libelant.

Williams, Neethe & Williams, of Galveston, Tex., for respondents.

HUTCHESON, District Judge. This is a libel to recover from the defendants sums deducted by them in an accounting made by them with libelant, under the terms of a charter party attached to the libel, which charter party the defendants say authorized these deductions, and which charter party the libelant declares authorized none of them. The charter party provided for the chartering of the vessel Laponia to Wilkens & Biehl, the defendants, and, in addition to many other provisions, provided as follows:

In clause 1, that the steamer should proceed to Houston and (or) Galveston, and, there having been provided to carry a full cargo of cotton, shall load from the charterers from such wharf or dock as they may select, and if afterwards required by them to shift from one terminal to another at any port more than once, they to pay the ordinary expenses of towing, a full and complete cargo.

In clause 2, charterers are to pay for loading cargo and compressing cotton at load-

ing port, but no other charges, and the stevedore to be appointed by them is to load the steamer under the captain's direction.

In clause 3, charterers to have the option of loading at any two of the above ports, they paying all extra port charges incurred at the second port.

In clause 4, all ordinary disbursements at port of loading to be paid by the charterers, who are to be reimbursed for the amount thereof, with 2½ per cent. commission thereon.

In clause 5, the customs and usages at the ports of loading and discharging to be observed, unless otherwise expressed.

In clause 20, owners to pay charterers two shillings per net register ton, in consideration of which charterers agree to pay port charges at loading ports on outward cargo, viz. tonnage dues, custom house fees, levee dues, quarantine fees, and cost of fumigating, wharfage, watching, and outward pilotage.

The charges paid by the agents, and deducted in their accounting with the vessel, are as follows:

| | |
|---|---:|
| Pilotage from wharf No. 8, Houston, to Anderson's dock, September 20, 1923 ............................$ | 20.00 |
| Pilotage from Long Reach pier, Houston, to Sinclair docks, September 26, 1923 ............................ | 20.00 |
| Pilotage from Houston to Galveston, September 26, 1923............... | 42.50 |
| Pilotage from Bolivar to pier No. 38, Galveston, September 26, 1923..... | 20.00 |
| Boat hire for shifting from pier No. 8, Houston, to Long Reach pier, September 26, 1923............... | 8.00 |
| Boat hire releasing from Long Reach pier to Galveston, September 26, 1923 ............................ | 8.00 |
| Boat hire for releasing from pier No. 38, Galveston, to "Ca"............ | 5.00 |
| Releasing lines and mooring ship at Galveston, September 26, 1923..... | 10.00 |
| Inspection and certificate of loading at Houston and Galveston, September 20, 1923..................... | 35.00 |
| Marine branch of Houston Cotton Exchange September 29, 1923....... | 83.22 |
| Marine branch of Galveston Cotton Exchange September 29, 1923..... | 66.90 |
| Towage, assisting vessel off dock, pier No. 38, September 29, 1923........ | 40.00 |
| Towage, assisting vessel to dock, pier No. 38, Galveston, September 26, 1923 ............................ | 40.00 |
| Shed hire, Houston Compress Company, September 27, 1923.......... | 50.00 |
| Shed hire, Galveston Wharf Company, September 28, 1923............... | 150.00 |
| Dockage, Houston Compress Company, September 27, 1923.......... | 140.75 |
| Dockage, Galveston Wharf Company, September 28, 1923............... | 281.50 |
| Total | $1,020.12 |

The libelant insists that these various items should have been paid by the charterers, either on the ground that they were loading expenses (clause 2), or that they were extra port charges (clause 3), or that they were payable under clause 20 of the charter party as port charges, which the charterers had agreed to pay.

The defendants point to the fact that the charter declares (clause 2) that the charterers are to pay for loading cargo and compressing cotton at loading port, but no other charges, and that it also provided (clause 4), "All ordinary disbursements at the port of loading to be paid by charterers, who are to be reimbursed for the amount thereof," and they declare that none of the items are either loading charges or extra port charges, or included in clause 20, but are ordinary disbursements at the port of loading, which, under clause 4 of the charter party, the vessel agrees to pay.

Upon first inspection these respective clauses relied upon by the litigants appear conflicting, but an analysis of them will, I think, make it clear that no real conflict exists. What the charter does is to set out those things which are the primary obligation of the charterers, and those which are the primary obligation of the ship, and this it does with clearness and precision. The obligations primarily imposed upon the charterers are loading and compressing cotton, and extra port charges at the second port. All other disbursements, expenses, etc., are primarily chargeable to the ship and her owners.

[1] This being settled by the preliminary provisions of the charter, clause 20 provides that, in consideration of the owner paying the charterer a fixed sum, 2 shillings per net registered ton, the charterer agrees to discharge some of those obligations already primarily fixed by the charter upon the owner, to wit, port charges at loading ports on outward cargo, and, if the charter had stopped there, the case for libelant would present no difficulty, since the charter provides in clause 5 *that the customs and usages at the ports of loading and discharging should be observed,* and under the proof in this case all of the charges made at the two ports were made in accordance with the customs and usages of those ports. And this the defendants are bound to admit, for, if they had not been authorized and proper expenditures by the customs of the ports, they would not have been authorized to lay out the moneys in the first place, and therefore could not recover them back in the second.

The first difficulty in the case arises out of the question whether the "viz." and what follows it should be given the effect of a videlicet in pleading to limit the agreement of the charterers to the assumption of the specific disbursements there set down, or whether the word should be treated as used in the sense of "such as," or "for example," illustrative, but not exclusively furnishing examples of the kind referred to, rather than limiting to the particular charges named. Even in pleading the use of a videlicet varies. As Lord Hobart says: "A videlicet is a kind of interpreter. It may work a restriction, when the former words are not express and special, though the former words, by construction of law, would have had a larger sense if the videlicet had not been."

In some instances, where a videlicet is used to set out a time or place, it has the effect to save the pleader from having to prove that time and place with particularity; but its most usual effect is to restrain preceding allegations by particularity, and to limit the general by the particular. 4 Words and Phrases, Second Series, 1184; 8 Words and Phrases, 7319; Tullis v. Shaw, 169 Ind. 662, 83 N. E. 376; Commonwealth v. Hart, 76 Mass. (10 Gray) 465. "The precise and legal use of a videlicet in every species of pleading is to enable the pleader * * * to distinguish, and to fix with certainty, that which was before general, and which, without such explanation, might with equal propriety have been applied to different objects."

In Sullivan v. State, 67 Miss. 346, 7 So. 277, the court said: "The common office of a videlicet is to state time, place, or manner which are not of the essence of the matter in issue, and thereby to relieve the party of the duty of proving the allegations strictly as made; but it may be, and is frequently, used as particularizing the more general antecedent matter." If a party in pleading uses a generic term comprising many species or particulars, and afterwards uses a videlicet.

As in a prosecution involving the use of intoxicating liquor, though the particular kind of liquor need not be stated, if the videlicet follows the general words "intoxicating liquor," specifying the kind, it restrains the proof to the kind named. If the words following the "viz." were sufficient to embrace all of the items of disbursement, of course it would be unnecessary to decide its effect; but since these following words are limiting, and do not cover as wide scope

as the general term "port charges," it is necessary for the court to give it its proper legal effect, and since the arrangement is made for a fixed sum, presumably upon a basis of approximate pre-estimation, a reasonable construction of the charter party would lead to the conclusion that the use of the videlicet was for the purpose of limiting the general, and of making an agreement to discharge only the particular, charges named.

I therefore reject the contention of libelant that clause 20 covers all disbursements made at the two ports, and proceed to consider the items claimed in the light of the three questions remaining for solution: (1) Were any of the charges "loading" charges? (2) Were any extra "port charges"? (3) Were any covered by the particular items which, under clause 20, the charterers agreed to pay?

[2] The first four items in the account, totaling $102.50, are for pilotage. Libelant claims them as covered by the agreement under clause 20 for the payment of outward pilotage, while defendants contend that this term applies to pilotage outward bound from the last port of loading. Defendants' contention must be rejected, because the reference in clause 20 of the charter is to "ports," plural, and not to "port," singular, and the charter clearly contemplated, not the payment of pilotage from the last port of entry, but all pilotage out going after any part of the cargo had been laden.

The next two items, amounting to $8 each, libelant concedes are not recoverable.

[3] The remaining items incurred, according to the customs and usages of the ports of Houston and Galveston, are as to the Galveston items claimed as extra port charges, and as to the Houston items claimed either as loading charges or as covered by clause 20.

Turning first to the Galveston items, I think it clear that they are all chargeable to the charterers under clause 3 as extra port charges incurred in accordance with the customs of the port of Galveston, and which would not have been incurred had there been one port of loading. "Extra port charges" is a general term intended to include all charges made at the second port in connection with the vessel and cargo, and are customary charges paid in connection with the entry of the ship, the securing and loading of the cargo, and the departure of the ship from port, and these charges under consideration, incurred at Galveston,

are clearly a part of such customary charges, and therefore recoverable.

As to the charges incurred at Houston, inspection and certificate of loading at Houston, marine branch of the Houston Cotton Exchange, shed hire Houston Compress Company, and dockage Houston Compress Company, the matter as to some of them is not without difficulty. For, while I think it clear that none of them can be claimed under clause 2 as loading charges, primarily imposed upon the charterer, since it is evident that the word "loading," as used in that clause, has reference to the transference from the wharf to the ship, and the storage in the ship of the cargo, the conclusion that some of them are not included under clause 20 is not so easily reached.

Examining them in their order, in the light of clause 20, the item of inspection and certificate of loading, Houston; and the charge for the marine branch of the Houston Cotton Exchange, may be without difficulty rejected, since, while they are port charges, and would have been recoverable under a general agreement to pay port charges, they are not mentioned in the enumeration of particulars.

The items of shed hire and of dockage, however, paid to the Houston Compress Company for the use of its wharves and shed berth, are insisted upon as included in the general definition of "wharfage," and as to the dockage that it is also properly recoverable under the agreement to pay tonnage dues. "In its most general legal sense, wharfage is the use of a wharf furnished in the ordinary course of navigation." The Jas. T. Furber (D. C.) 129 F. 808; Carsanego v. Wheeler (D. C.) 16 F. 248; 40 Cyc. 894.

In 28 R. C. L. § 19, p. 36, it is said: "The right to collect wharfage or dockage is a franchise." The same text says: "Ordinary wharfage is a charge for the purpose of loading or unloading a cargo on the dock or wharf, which necessarily includes a berth for the vessel and deposit for the cargo. The wharfage may accrue from the use of the dock or wharf for mooring, for the purpose of protection and safety, and while tonnage dues as such may not be collected by a state or its subdivisions, the fact that wharfage is proportioned to the tonnage of the vessel does not make it unconstitutional: Keokuk Northern Line Packet v. Keokuk, 95 U. S. 80, 24 L. Ed. 377.

In the Wharf Case, 3 Bland. (Md.) 361, it is said: "Moorage is the sum due by law or usage for the mooring or fastening of ships to trees or posts at the shore or to the wharf. Wharfage is the toll or duty for the pitching or lodging of goods upon a wharf. These two kinds of shore duties, as thus designated in the English books, which are evidently distinct in their nature, the one as a charge for the accommodation of ships, the other as a toll for the landing place of goods, are in our country generally, and certainly in the port of Baltimore, spoken of under the one common denomination of 'wharfage.' The wharfage due from a vessel, and the wharfage payable on merchandise."

In Mayor of Baltimore v. Baltimore, 104 Md. 485, 65 A. 353, the court said: "The word 'wharfage' is usually and ordinarily employed to designate the charge made for the use of a wharf for the purpose of loading or unloading freight. * * * The * * * word is sometimes used synonymously with 'dockage' or 'moorage,' to describe the charge made by the owner of a dock or basin for the privilege of allowing a vessel to lie there."

In the Keokuk Case, the word "wharfage" there construed covered both of these features.

In The George E. Berry (D. C.) 25 F. 781, it was said: "Wharfage in its most general legal sense doubtless includes the mooring of vessels for the purpose of protection and safety, as well as for loading and unloading a cargo."

In The Brooklyn, 46 F. 132, the court said: "A contract by a wharfinger to furnish 'dock privileges' for 'the unloading of a cargo of iron * * *' includes the wharfage charges for giving the vessel a berth alongside the wharf, as well as the charges for space on the dock occupied by cargo," the court saying, "The terms 'dockage' and 'wharfage' are synonymous. They are used interchangeably. * * * Wharfage or dockage is the charge for the use of a wharf or dock. It may accrue from the use of the dock in mooring for the purposes of protection and safety only. * * * But in this port such a charge is ordinarily for the purpose of loading or unloading cargo on the dock, and that includes necessarily a berth for the vessel, and a place of deposit for the cargo."

In People v. Roberts, 92 Cal. 659, 28 P. 689, it was declared that, under the California statute there under construction, the terms "dockage" and "wharfage" had different meanings. The term "dockage" was used to define the charge against a vessel for lying at a wharf, while the term "wharfage"

was a charge connected with the use of the wharf for the cargo.

Tonnage dues, in the legal sense of an assessment by state or municipal authorities for the use of a port, may not be assessed consistently with the Constitution of the United States. Packet Co. v. Keokuk, 95 U. S. 84, 24 L. Ed. 377; Transportation Co. v. Parkersburg, 107 U. S. 696, 2 S. Ct. 732, 27 L. Ed. 584. But it is competent for either a private wharfinger or a municipal corporation to charge and collect wharfage in proportion to the tonnage of a vessel as compensation for the use of wharfs. Keokuk Packet Co. v. Keokuk, 95 U. S. 84, 24 L. Ed. 377.

This being the case, a charter providing for loading at domestic ports and for the payment of tonnage dues ought perhaps to be construed as referring to legal, and not illegal, exactions, and as referring to wharfage assessed upon a tonnage basis, and, were the point essential for decision, I would be inclined to so hold. Whether this should be held or not is immaterial here, for the charter provides for both "tonnage dues" and "wharfage," and if the provision for "tonnage dues" be construed narrowly, as referring only to those municipal levies prohibited by the Constitution, the term "wharfage" must be taken as used in the sense referred to in the Keokuk Case, as a charge apportioned to the tonnage of a vessel mooring and landing at the wharves.

[4] In short, the item of dockage, which, as the witness testified, "is a charge assessed against ships on their gross registered tonnage at our dock for the number of days the ship is at our wharf," is either collectible under the provision for tonnage dues, or under that for wharfage taken in its broad, but accepted, sense, as a charge for the use of a wharf, both for the berthing of a ship and a deposit for the cargo.

As to shed hire, which the witness testified is "a charge for the use of a shed berth for the steamer to assemble cargo," there can be no question that it is included in and is chargeable as wharfage.

While I have already concluded that the shed hire and dockage at Galveston is covered by the provision for extra port charges, what I have said as to shed hire and dockage charged at Houston is equally applicable to shed hire and dockage at Galveston, so that it is recoverable under clause 20, as well as under clause 3, as extra port charges.

It is my conclusion, therefore, that libelant have judgment for the items sued for, except the two $8 items, boat hire, $25 of the

$35 charges for loading and inspection certificate, Houston and Galveston, and $83.22 charged by the marine branch of the Houston Cotton Exchange.

Let a decree be drawn for the amount sued for, less these items, with interest and costs.