## Paul E. THOMSON
### v.
## CHESAPEAKE YACHT CLUB, INC.
### Adm. No. 4820.

United States District Court
D. Maryland.

Oct. 26, 1965.

Supplemental Opinion Aug. 9, 1966.

———◆———

Bardyl Rifat Tirana and Amram, Hahn & Sundlun, Washington, D. C., and Frank A. Kaufman, Baltimore, Md., for libelant.

Southgate L. Morison, Baltimore, Md., for respondent.

THOMSEN, Chief Judge.

Respondent has excepted to the libel on the ground that the claim alleged is not within the admiralty and maritime jurisdiction.

The libel alleges that at or about 2100 hours on April 24, 1965, libelant, a citizen of Virginia, whose boat was moored at respondent's pier in the West River near Shady Side, Maryland, fell into navigable water through a hole in an extension to the pier, several hundred feet from shore, when he went onto the dock to resecure the mooring lines. It is further alleged that as a result of the fall and immersion in the cold water libelant sustained permanent injuries, but he claims that he received no injury or damage until he struck the water.

Everyone agrees that "the locality of the tort" controls the issue of admiralty jurisdiction in such a case as this; if the tort occurred on or in navigable waters the maritime law applies; if the tort occurred on land it does not apply. But the authorities do not clearly indicate the proper answer to the question where the tort alleged in this libel occurred.

One point is clear; piers, docks, wharves and similar structures extending over navigable waters are extensions of land, though their use and purpose be maritime. Hastings v. Mann, 4 Cir., 340 F.2d 910, 911 (1965). Personal injuries suffered while upon such structures are not compensable in admiralty, unless caused by a vessel on navigable waters, in which event the Admiralty Jurisdiction Extension Act of 1948 gives admiralty jurisdiction.

Some years before the passage of that act the Supreme Court decided Minnie v. Port Huron Terminal Co., 295 U.S. 647, 55 S.Ct. 884, 79 L.Ed. 1631 (1935), and The Admiral Peoples, 295 U.S. 649, 55 S.Ct. 885, 79 L.Ed. 1633 (1935). In Minnie the Court held that a longshoreman who was swept from the deck of a ship by the ship's hoist and precipitated onto a wharf was entitled to sue in admiralty. In The Admiral Peoples the Court held that a passenger who fell four feet from a defective gangplank onto a pier was entitled to sue in admiralty, since the defective gangplank was a part of the ship, even though the libelant had suffered no injury until she struck the pier. The Court quoted with ap-

proval from The Strabo, 2 Cir., 98 F. 998, 1000 (1900), as follows: " 'The cause of action originated and the injury had commenced on the ship, the consummation somewhere being inevitable. It is not of vital importance to the admiralty jurisdiction whether the injury culminated on the stringpiece of the wharf or in the water.' " 295 U.S. at 653, 55 S.Ct. at 887.

Respondent in the instant case contends that the principle applied in The Admiral Peoples should be applied here, and that admiralty jurisdiction should be denied because the injury and cause of action originated on the dock, a part of the land, even though it "culminated" in the water.

Some cases both before and after The Admiral Peoples emphasize the place where the tort was "consummated." In The Plymouth, 3 Wall. 20, 70 U.S. 20, 18 L.Ed. 125 (1865), decided, of course, long before the Act of 1948, the Supreme Court had held that there was no jurisdiction in admiralty to award damages against a vessel for loss caused by a fire which had spread from a vessel to a pier and its associated warehouses. Since the tort was consummated upon land and the injury suffered there, the tort was regarded as local in nature and not cognizable in admiralty. In Leonard v. Decker, S.D.N.Y., 22 F. 741, 742 (1884), Judge Addison Brown said "the place where the injury is consummated and the damage actually received is regarded as the locus of the tort." See also Hermann v. Port Blakely Mill Co., N.D.Cal., 69 F. 646 (1895).

Since The Admiral Peoples, admiralty jurisdiction has been expanded in several types of cases, particularly claims under the Longshoremen's and Harbor Workers' Compensation Act and cases involving aircraft crashing into the sea.

Among the compensation cases are Calbeck v. Travelers Insurance Co., 370 U.S. 114, 82 S.Ct. 1196, 8 L.Ed.2d 368 (1962), Interlake Steamship Co. v. Nielsen, 6 Cir., 338 F.2d 879 (1964), Marine Stevedoring Corp. v. Oosting, E.D.Va., 238 F.Supp. 78 (1965), and Johnson v. Traynor, D.Md., 243 F.Supp. 184 (1965), both now on appeal to the Fourth Circuit. In the Interlake case a shipkeeper, in the course of his employment, drove his car off the end of the dock where his ship was berthed, and died of a skull fracture caused by impact upon the frozen waters of Lake Erie. After noting the broadening of the admiralty jurisdiction in certain tort cases, the Sixth Circuit said:

"It seems obvious to us that the trend of case law, the impact of the Admiralty Extension Act, and the effect of Calbeck have all pointed in the direction of expanding the boundaries of admiralty jurisdiction toward land. It does not require any great clairvoyance to hold that at present admiralty jurisdiction clearly encompasses the navigable waters immediately adjacent to a dock.

"If Calbeck holds (and we think it does) 'that Congress intended the compensation act to have a coverage co-extensive with the limits of its authority,' then there can be no doubt about the outcome of this appeal. No one asserts that claimant was killed (or injured) until the impact on the frozen substance of the navigable waters at the end of the dock. The fact which impressed the District Judge—that the impetus which propelled claimant onto the ice had a land-based origin—does not alter the fact that the situs of his injury and death was clearly within the scope of admiralty jurisdiction." 338 F.2d at 882, 883.

Compensation cases present a somewhat different question than the tort cases, as the Sixth Circuit recognized in Wiper v. Great Lakes Engineering Works, 6 Cir., 340 F.2d 727 (1965). There, in answer to a contention that the trial court should have applied maritime law rather than Michigan law in the case of a seaman who apparently walked off a dock into navigable water, the Sixth Circuit said:

"Under the allegations of the complaint, defendant's negligently kept dock resulted in decedent's death by

drowning in navigable waters, and therefore plaintiff contends that the tort should be deemed to have occurred in navigable water. However, docks and wharves are considered as extensions of land, American Export Lines, Inc. v. Revel, 266 F.2d 82 (4th Cir. 1959); Netherlands American Steam Nav. Co. v. Gallagher, 282 F. 171 (2nd Cir. 1922); The Plymouth, 3 Wall. 20, 70 U.S. 20, 18 L.Ed. 125 (1865); Hughes, Admiralty (2d Ed.) Sec. 198; 2 Am.Jur. 741, 767–768, ADMIRALTY Sec. 84, and therefore the negligently maintained dock which presumably caused the decedent to fall was land, and the decedent was on land at the time he was caused to fall. Thus, the tort was complete before decedent ever touched the water and this being true, the subsequent drowning is significant not to determine the maritime or non-maritime nature of this action but only as it relates to damages, Cleveland Terminal and Valley R.R. Co. v. Cleveland Steamship Co., 208 U.S. 316, 28 S.Ct. 414, 52 L.Ed. 508 (1908); The Plymouth, 3 Wall. 20, 70 U.S. 20 [18 L.Ed. 125] (1865).

"The very recent opinion in Interlake Steamship Co. v. Nielsen, 338 F.2d 879 (6th Cir. 1964), where a shipkeeper in the course of his employment drove his car off the dock where his ship was berthed and was killed by his impact on the ice in navigable waters is distinguishable from the present case. There the coverage of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 903(a), was held to extend to a claim for injury or death when the situs of the injury or death was in navigable waters regardless of whether the cause had a land-based origin. In the present case it is the locality of the tort that governs the question of whether maritime or state law is applicable rather than the locality where the injuries or death occurred which, as held by Interlake, determines coverage under the Longshoremen's and Harbor Workers' Compensation Act. For these reasons then, there is no merit to plaintiff's claim that the tort here in question occurred in navigable waters." 340 F.2d 730, 731.

In the aircraft cases, discussed at length in Weinstein v. Eastern Airlines, Inc., 3 Cir., 316 F.2d 758 (1963), the following rule has been developed: in applying the locality test for admiralty jurisdiction, the tort is deemed to occur, not where the wrongful act or omission has its inception, but where the impact of the act or omission produced such injury as to give rise to a cause of action. See 316 F.2d at 765. In 2 Am.Jur.2d, Admiralty, § 85, it is said: "If a person or property is precipitated from the land into the sea as the result of a wrongful act or omission, and there is no impact on the person or property before he or it strikes the water, the tort, for jurisdictional purposes, is considered to have occurred on the water."

It is difficult, if not impossible, to reconcile the opinions in such cases as The Admiral Peoples, The Strabo and Wiper with the opinions in the compensation, the aircraft and some other tort cases. It is true that recent statutes and decisions have broadened the admiralty jurisdiction, but the broadening has in most instances been for the benefit of seamen and longshoremen. Neither the Compensation Act nor the Admiralty Jurisdiction Extension Act of 1948 has anything to do with the case at bar. Cases pertaining to Jones Act (46 U.S. C.A. § 688) liability are not in point, for the responsibility of the employer to his seaman-employee thereunder is not circumscribed by any jurisdictional requirement that the situs of the injury be upon the water. The sole jurisdictional requirement is injury in the course of a seaman's employment. In addition, cases of unseaworthiness liability for land injuries are inapposite because "the tort of unseaworthiness arises out of a maritime status or relation and is therefore 'cog-

558

nizable by the maritime [substantive] law whether it arises on sea or on land' [Strika v. Netherlands Ministry of Traffic, 2 Cir. 1950, 185 F.2d 555, 558]." Guttierez v. Waterman Steamship Corp., 373 U.S. 206, 214, 83 S.Ct. 1185, 1190, 10 L.Ed.2d 297 (1963).

The cases involving aircraft crashing into the sea refer to the place where the "impact" of the negligent act or omission produces such injury as to give rise to a cause of action. The term "impact", as so used, is confusing, since an action for negligence does not always involve a physical impact (e. g., where recovery has been allowed for fright), and may on the other hand involve two impacts, one on land and one in the water, as when a man falls on the dock and rolls into the river. It might be more accurate to refer to the place where the negligent act or omission *becomes operative or effective* upon the plaintiff, so as to cause an injury to him, whether the physical injury and damage is suffered and completed on land or in navigable water. That is substantially the test which was applied in The Admiral Peoples, The Strabo, Wiper and other cases.

The opinion of the Fourth Circuit in Hastings v. Mann, 340 F.2d 910 (1965), is helpful in stating the applicable general principles, but the decision is not controlling here because the negligent condition, the fall and the resulting injury all occurred on the launching ramp, which was an extension of the land.

The aircraft cases present special problems. Although the negligence may have occurred on land, where there was negligent maintenance, the impact (effect) of the negligence on the passengers did not occur until something went wrong during the flight and the plane started to fall. Something may have started to go wrong over the land before the plane reached the sea, but that is usually impossible to prove one way or the other in aircraft cases, and the decisions adopt a practical approach.

If libelant had sustained cuts or bruises, a fracture or a sprain, while falling through the hole, the tort would concededly have been consummated on land, even though a portion of the injuries and damage were suffered or occurred in the water; the Court could not divide the damage, saying that one portion is covered by state law, the other by maritime law.

Reductio ad absurdum may be used to test a proposition in law as well as in logic. If a man visits a friend's shore and trips on a negligently constructed dock, does he have the right and is he required to sue in admiralty rather than at law if he falls into the river without striking the dock? Is the decision affected by the further question whether he came to his friend's place by automobile or by boat? Principles governing jurisdiction should not be "built upon such quicksands", to borrow a phrase used by Judge Cardozo in Hynes v. New York Central R. Co., 231 N.Y. 229, 131 N.E. 898, 900, 17 A.L.R. 803 (1921), an opinion in which "considerations of analogy, of convenience, of policy, and of justice" were relied upon in deciding a somewhat analogous question.

There are advantages and disadvantages to both sides in admiralty or at law. In admiralty the doctrine of comparative negligence applies; at law either side may elect a jury trial.

In the instant case the situs of the negligence and the situs of its impact (effect) on libelant is clear; he was on the pier, an extension of the land, at the time he fell through the hole. The realistic, practical and fair rule is that applied in The Admiral Peoples, The Strabo and Wiper. Whether or not libelant suffered any damage before he struck the water, the negligent act or omission became operative on him, so as to cause his injury, while he was still on the land, although the injury may have culminated or been completed in the water, and most of the damage suffered there.

After weighing all factors, considerations and authorities, the Court concludes that this case does not come within the admiralty jurisdiction.

## Supplemental Opinion

After the opinion of this Court dated October 26, 1965, libelant asked and was granted leave to file an amended libel. He alleges therein:

"FOURTH: This is a cause of action maritime and civil for damages arising out of a maritime contract for services and facilities, whereby, for good and valuable consideration, respondent agreed to provide marina, wharfage and pierage services to libellant and his vessel, and whereby respondent warranted to libellant a safe berth for his vessel and a safe pier for access between the vessel and shore."

Respondent has excepted to the amended libel "on the ground that if the accident occurred on the pier Admiralty has no jurisdiction."

In his brief on the exceptions to the original libel, the only argument made by counsel for libelant was: "When a person is precipitated from land into the navigable waters as the result of a wrongful act or omission, and there is no impact on the person before he strikes the water, the tort is within the admiralty jurisdiction." Libelant did not argue that the question presented involved any element of maritime contract or status between the parties.

In his brief on the exceptions to the amended libel, with which we are now concerned, counsel for libelant argues: "If a person is precipitated from a pier into the navigable waters as the result of a breach of the wharfinger's contract to provide a safe pier for access between his vessel and the land, is his claim for resulting personal injuries within the admiralty jurisdiction?" The contractual element so introduced into the case requires a reconsideration of the question of jurisdiction.

The parties have filed a "stipulation with respect to jurisdictional facts", wherein they have agreed that the facts summarized below were true at all pertinent times:

1. Libelant was a dues-paying member in good standing of the Solomon's Island Yacht Club.

2. That club and respondent Chesapeake Yacht Club, Inc., were members of the Chesapeake Bay Yacht Clubs Association, of Baltimore, Maryland.

3. Each yacht club belonging to the Association agreed to extend reciprocal dockage and other services to the members of other yacht clubs belonging to the Association.[1]

4. Respondent, Chesapeake Yacht Club, Inc., adopted the following policy with regard to dockage:

a. If the person requesting dockage is a member of one of the yacht clubs of the Association, respondent will provide dockage. There is no charge made for dockage up to 72 hours. Thereafter, charges for the vessel are ten (10) cents per foot per day.

b. If the person requesting dockage is not a member of one of the yacht clubs of the Association, respondent may provide dockage at the discretion of an officer or the steward. Charges are made for such dockage at the rate of ten (10) cents per foot per day.

\* \* \* \* \* \*

5. Libelant arrived at respondent's dock on April 24, 1965, in a forty-foot Pacemaker. Because of bad weather, libelant requested dockage from respondent's steward. Libelant established to the steward's satisfaction that he was a member of the Solomon's Island Yacht Club, entitled to docking privileges under the Association's rules.

6. Libelant and respondent's steward had no discussion as to charges at any time. Because libelant requested only overnight dockage, for which there would be no charge, the steward

---

1. The Constitution and By-Laws of the Chesapeake Bay Yacht Clubs Association and the recommendations pertaining to reciprocity were made a part of the stipulation.

did not ask libelant to fill out a registration card.[2]

7. The steward assigned a slip to libelant, at which libelant moored his vessel.

8. Because of the accident alleged in the amended libel, libelant was hospitalized. Libelant's vessel, therefore, remained at respondent's facilities until May 1, 1965, which was the earliest date that libelant could arrange for its removal.

9. Respondent did not charge libelant for the excess period beyond 72 hours during which his vessel was moored at respondent's slip.

In North Pacific S.S. Co. v. Hall Bros. Co., 249 U.S. 119, 125, 39 S.Ct. 221, 222, 63 L.Ed. 510 (1919), the Supreme Court said:

"It must be taken to be the settled law of this court that while the civil jurisdiction of the admiralty in matters of tort depends upon the locality, whether the act was committed upon navigable waters, in matter of contract it depends upon the subject-matter, the nature and character of the contract, and that the English rule, which conceded jurisdiction, with a few exceptions, only to contracts made and to be executed upon the navigable waters, is inadmissible; the true criterion being the nature of the contract, as to whether it have reference to maritime service or maritime transactions."

In United States v. Standard Oil Co., 9 Cir., 156 F.2d 312, 314-315 (1946), the court said:

"The fact that the breach of a maritime contract proximately causes damage ashore does not place the liability for damage beyond the jurisdiction of an admiralty court. * * *

"So also a shipowner's obligation for maintenance and cure covers injuries while ashore, received on premises not belonging to the shipowner * * * In Union Fish Co. v. Erickson, 9 Cir., 235 F. 385, 386, 387, this court * * * quotes and relies upon Judge Curtis' language in Church v. Shelton, 2 Curt. 271, 274, Fed.Cas.No.2,714, that the contract being maritime, the admiralty 'will proceed to inquire into all its breaches, and all the damages suffered thereby, however peculiar they may be, and whatever issues they may involve.'"

In Wiper v. Great Lakes Engineering Works, 6 Cir., 340 F.2d 727 (1965), one of the cases cited by this court in its prior opinion herein, the Sixth Circuit prefaced its discussion of the problem by saying:

"Plaintiff's contention, however, that maritime law is applicable must be rejected for it is well-settled that *absent a maritime status between the parties* the traditional test of locality of the tort governs the question of whether maritime or state law is applicable." (emphasis supplied)

The question presently before the court is whether the amended libel (amplified by the stipulated facts) alleges such a maritime contract or maritime status between the parties as would bring the case within the admiralty and maritime jurisdiction. This court concludes that such a maritime contract or maritime status is sufficiently alleged. Dock or wharf accommodations are a necessity of navigation, Ex Parte Easton, 95 U.S. 68, 73, 24 L.Ed. 373 (1877), and claims arising out of contracts with respect thereto have been held to be within the admiralty jurisdiction. See e. g. Ex Parte Lewis, Cir.Ct., D.Mass., 15 Fed.Cas. 451, 452, No. 8,310 (1815); The Kate Tremaine, E.D.N.Y., 14 Fed. Cas. 144, 145-146, No. 7,622 (1871).

2. It is alleged in the amended libel that "Respondent's steward for a fee to be paid by libelant to respondent, and other good and valuable consideration, gave libelant permission to moor and directed him to a berth."

It is not necessary to decide at this time whether the alleged contract included the warranty claimed by libelant; indeed, the facts proved at the trial may or may not establish the existence of any contractual or other maritime relationship between the parties. But, for the reasons stated above, the exceptions to the amended libel are hereby overruled.