**STATE OF MARYLAND, DEPARTMENT OF NATURAL RESOURCES, and Maryland Port Administration**

v.

**AMERADA HESS CORPORATION, a Delaware corporation**

**and**

**Harp Tankers Corporation, a Foreign corporation**

**Civ. No. 72–101.**

United States District Court, D. Maryland.

Sept. 22, 1972.

Francis B. Burch, Atty. Gen., for Maryland Port Administration, Baltimore, Md., Warren K. Rich, Special Asst. Atty. Gen., Dept. of Natural Resources, Annapolis, Md., for plaintiff.

Joseph H. H. Kaplan, Benjamin Rosenberg, and William Giacofci, Baltimore, Md., for defendant Amerada Hess Corp.

Richard R. Jackson, Jr., and Robert V. Barton, Jr., Baltimore, Md., for defendant Harp Tanker Corp.

HERBERT F. MURRAY, District Judge.

The State of Maryland, Department of Natural Resources, and Maryland Port Administration ("State"), plaintiff herein, has brought suit against the Amerada Hess Corporation and the Harp Tanker Corporation to recover damages incurred as a result of an oil discharge into the Baltimore Harbor. The complaint alleges that on or about April 15, 1970, The S.S. Kadmos, Lloyds Registry Number 517826, a vessel owned by the Harp Tanker Corporation, was in the process of unloading oil at the Amerada Hess Corporation plant located at 6200 Pennington Avenue, Baltimore, Maryland. While the S.S. Kadmos was moored to a pier operated by the Amerada Hess Corporation, the transfer line between the vessel and the shore terminal ruptured, thereby discharging oil into the waters of the Baltimore Harbor. Plaintiff seeks relief in the form of damages to compensate for injury to the waters arising out of pollution to said waters and for costs of abatement. Jurisdiction is invoked pursuant to the admiralty and maritime jurisdiction of the federal courts.

Amerada Hess Corporation ("Amerada Hess") has filed a motion to dismiss, pursuant to Rule 12(b) of The Federal Rules of Civil Procedure, and as grounds therefor has alleged:

1. That this is not a case of admiralty and maritime jurisdiction under 28 U.S.C. § 1333.

2. That the State of Maryland does not have a property interest in the waters of the State and therefore cannot sue for damages to the condition or quality of the water.[1]

3. That the oil spill is so transient a condition as to not constitute a public nuisance as is alleged in Paragraph 6 of Count 1.[2]

4. That the alleged acts of Amerada Hess Corporation complained of took place prior to the enactment of Article 96A, §§ 29B and 29D, Annotated Code of Maryland, which therefore are not, as contended by the plaintiff in Paragraphs 2 and 3 of Count II, applicable to the instant suit.

Harp Tanker Corporation ("Harp Tanker") has also filed a motion to dismiss and has alleged the following:

1. That the State of Maryland does not have a property interest in the waters of the State and therefore cannot claim damages for injury to the condition and quality thereof.[3]

2. That the oil spill is so transient a condition as to not constitute a public nuisance as is alleged in Paragraph 6 of Count III.[4]

3. That the alleged acts of Harp Tanker Corporation complained of occurred before the enactment of Article 96A, §§ 29B and 29D, An-

---

1. Paragraph 6 of Count I of the Complaint alleges that the negligence and reckless acts of the agents and employees of the Amerada Hess Corporation "irreparably damaged the condition of said waters, impaired the quality of said waters, created a public nuisance, and has permanently harmed the fish and acquatic life living therein and other wildlife dependent directly on the waters of the State for their sustenance."

2. *Id.*

3. Count III, Paragraph 6 alleges that as a result of the negligence and reckless acts of the crew of the S.S. Kadmos "The oil discharged into the waters of the State of Maryland has irreparably damaged the condition of said waters, impaired the quality of said waters, creating a public nuisance, and has permanently harmed the fish and aquatic life living therein and other wildlife dependent directly on the waters of this State for their sustenance."

4. *Id.*

notated Code of Maryland, and therefore are not, as contended by plaintiff in Paragraphs 2 and 3 of Count IV, applicable to the instant suit.

4. Harp Tanker Corporation owes no duty to the plaintiff to provide a seaworthy vessel.[5]

Having considered all the memoranda filed by the parties and heard oral argument on the defendants' motions to dismiss, the Court will now proceed to the legal issues raised in the motions to dismiss.

## JURISDICTION

Each count of the complaint alleges that this is a case of admiralty and maritime jurisdiction. Amerada Hess, in its motion to dismiss, contends that the alleged wrongdoing of Amerada Hess Corporation occurred, if at all, on a shore facility, and the complaint, therefore, does not allege a maritime tort which would give rise to admiralty jurisdiction under 28 U.S.C. § 1333.[6]

The Constitution of the United States, Article III, Section 2, provides that the judicial power of the United States shall extend to "all Cases of admiralty and maritime Jurisdiction." Statutory implementation of this constitutional grant was enacted by Congress in Section 9 of the Judiciary Act of 1789, whose modern counterpart is codified in 28 U.S.C. § 1333. Since 1789, the courts have attempted to delineate the boundaries of this broad grant of jurisdiction by a process of judicial inclusion and exclusion on a case by case basis. The case at bar presents one more instance where a federal district court is required to decide whether a particular set of facts is such as to come within the court's admiralty and maritime jurisdiction.

In the early leading case of De Lovio v. Boit, 7 F.Cas. 418, (No. 3,776) (C.C. D.Mass.1815), Justice Story concluded that the jurisdiction:

"[C]omprehends all maritime contracts, torts, and injuries. The latter branch is necessarily bounded by locality; the former extends over all contracts, (wheresoever they may be made or executed, or whatsoever may be the form of the stipulations,) which relate to the navigation, business or commerce of the sea. * * * " 7 Fed.Cas. at p. 444.

Later cases follow Justice Story's lead in holding that the critical factor in determining whether a tort claim comes within the broad grant of admiralty jurisdiction is the situs of the tort:

"Everyone agrees that 'the locality of the tort' controls the issue of admiralty jurisdiction in such a case as this; if the tort occurred on or in navigable waters[7] the maritime law applies; if the tort occurred on land it does not apply. * * * " Thomson v. Chesapeake Yacht Club, Inc., 255 F.Supp. 555 (D.Md.1965).

The "locality test" was applied as early as 1865 in the landmark case of The Plymouth, 70 U.S. (3 Wall.) 20, 36, 18 L.Ed. 125 (1865), and has been consistently reiterated by the courts. *See, e. g.,* Weinstein v. Eastern Airlines, Inc., 316 F.2d 758, 761 (3d Cir. 1963), and the cases collected therein. "Admiralty jurisdiction extends to *every species of tort* committed upon the high seas or on navigable waters." United States v.

---

5. Count V of the Complaint alleges a cause of action against Harp Tanker Corporation for the unseaworthiness of the S.S. Kadmos.

6. Harp Tanker Corporation does not contest the Court's jurisdiction in this case.

7. Waters within the admiralty jurisdiction include not only the high seas but also those navigable in fact, regardless of whether or not they are subject to the ebb and flow of the tide. Weinstein v. Eastern Airlines, Inc., 316 F.2d 758, 761 n. 9 (3d Cir. 1963), *citing* Insurance Co. v. Dunham, 78 U.S. (11 Wall.) 1, 20 L.Ed. 90 (1870). The waters of the Baltimore Harbor are admittedly navigable, and therefore are within the territorial jurisdiction of admiralty.

Matson Nav. Co., 201 F.2d 610, 613 (9th Cir. 1953) (emphasis added). It follows, therefore, that when a court is confronted with an alleged admiralty tort claim, the initial question it must decide is whether the alleged tort occurred upon the high seas or on navigable waters. If it did, the court would have jurisdiction to entertain the suit. If, on the other hand, the tort is found to have occurred on land, the case must be dismissed for lack of subject matter jurisdiction.

In McCall v. Susquehanna Electric Company, 278 F.Supp. 209 (D.Md.1968), the proper application of the locality test was said to be the following:

"[I]n applying the 'locality' test for admiralty jurisdiction over torts it is not the place where the negligent acts occur that is all important, but rather the place where the tort occurs.

"A tort is deemed to occur not where the wrongful act or omission has its inception, but *where the impact of the act or omission produces such injury as to give rise to a cause of action.* Thomson v. Chesapeake Yacht Club, Inc., 255 F.Supp. 555 (D. Md.1965). Without an injury there is no cause of action, no tort, but only '*damnum absque injuria.*' Hough v. Western Transp. Co., supra, 3 Wall. at 36, 70 U.S. at 36, 18 L.Ed. 125." 278 F.Supp. at 211 (emphasis added).

*Accord,* Wilson v. Transocean Airlines, 121 F.Supp. 85, 92 (N.D.Cal.1954).

In *McCall* admiralty jurisdiction was found to exist when a floodgate in a dam was opened and allegedly caused the drowning of the decedent who was fishing in a small boat about one-quarter of a mile below the dam. Defendants in *McCall* argued that since the alleged act of negligence took place on land, there could be no admiralty jurisdiction. The court rejected this argument and ruled that the place of the injury controlled: "It is of little significance that the acts complained of had a land-based origin. * * * The tort alleged in the complaint occurred on navigable waters and consequently is a maritime tort." 278 F.Supp. at 211.

■ Applying the locality test to the present case, this Court has jurisdiction to entertain this suit. Assuming *arguendo* that the alleged negligence occurred on the shore facility of Amerada Hess, no tort arose until the oil entered the waters of Baltimore harbor. For, in this type of case, the tort takes place not where the negligent act occurs but rather where the act or omission becomes operative or effective.[8] In the instant case, although the allegedly negligent act occurred on land when the pipeline parted from the shore facility, the tort did not arise until the oil polluted the waters of the State. Thus, the act or omission which operated to produce the injury and gave rise to a cause of action occurred on the navigable waters of the State and consequently vested this Court with admiralty jurisdiction.

Amerada Hess seeks to avoid this result by taking the position that admiralty jurisdiction over cases of tort depends not only upon the locus of the tort, but upon a finding of some maritime connection or nexus with the alleged wrong. In other words, it is the contention of Amerada Hess that the tort must have a maritime "flavor" and that the locality test should not be the exclusive test of admiralty jurisdiction in matters of tort. Although this approach has been taken by some courts,[9] "the weight of authority is clearly to the effect that locality alone determines whether or not a tort claim is within the admiralty jurisdiction." Weinstein v. Eastern Airlines, Inc., *supra* 316 F.2d at 763.

---

8. Thomson v. Cheaspeake Yacht Club, Inc., supra 255 F.Supp. at 558.

9. *See, e. g.,* Chapman v. Grosse Pointe Farms, 385 F.2d 962 (6th Cir. 1967); McGuire v. New York, 192 F.Supp. 866 (S.D.N.Y.1961).

In Wilson v. Transocean Airlines, 121 F.Supp. 85 (N.D.Cal.1954), it was held:

> "Admiralty tort jurisdiction has *never* depended upon the nature of the tort or how it came about, but upon the locality where it occurred. * * * Locality has remained the sole test of admiralty tort jurisdiction despite recurring expressions of doubt whether the tort must not also bear some relation to the operation of a vessel." 121 F.Supp. at 92 (emphasis added).[10]

■ This Court knows of no case in this Circuit where the use of the locality test as the sole criterion for determining admiralty jurisdiction has been rejected. Moreover, the Court is in agreement with the weight of authority that the locality test should be used in the determination of whether or not a tort is maritime in nature. The Court is in accord with the case of California, By and Through Dept. of Fish and Game v. S. S. Bournemouth, 307 F.Supp. 922 (C.D. Cal.1969), which held injury to the navigable waters of the State of California caused by an oil spillage to be a maritime tort and within the court's admiralty jurisdiction. 307 F.Supp. at 926.[11]

For the above reasons, the Court finds that it does have admiralty jurisdiction to entertain the instant suit and will, therefore, proceed to the other arguments made by the defendants in their motions to dismiss.

## STANDING OF STATE TO SUE

The State of Maryland seeks damages from both defendants as compensation for injury to the condition or quality of the waters of the Baltimore Harbor allegedly resulting from the oil spill said to have occurred on or about April 15, 1970, as a consequence of the "improper, negligent and reckless acts" of the agents and employees of the Amerada Hess Corporation[12] and the Harp Tanker Corporation.[13] Both defendants seek dismissal of the counts in plaintiff's complaint brought pursuant to this negligence theory on the ground that the State of Maryland does not have a property interest in the waters of the State and therefore cannot sue for damages to the condition or quality thereof. The thrust of the defendant's argument is that the State does not "own the water, has a usufructuary rather than a proprietary interest therein, and has no common law civil remedy for damage to the condition and quality of the water."

In Browne v. Kennedy, 5 Har. & J. 195 (1821), the 4th section of the Charter to Lord Baltimore setting forth the terms of the grant to the Lord Proprietor of Baltimore was quoted (at p. 204):

> " 'Also we do grant, and likewise confirm, unto the said Baron of Baltimore, his heirs and assigns, all islands and islets within the limits aforesaid, and all and singular the islands and islets from the eastern shore of aforesaid region, towards the east, which have been, or shall be, found in the sea, situate within ten marine leagues from the said shore; with all and singular the ports, harbours, bays, rivers and straights, belonging to the region or islands aforesaid, and all and singular the soil, plains, woods, mountains, marshes, lakes, rivers, bays and straights, situate or being within the metes, bounds and limits aforesaid,

10. *See also* Wiper v. Great Lakes Engineering Works, 340 F.2d 727, 730 (6th Cir. 1965), cert. denied 382 U.S. 812, 86 S.Ct. 28, 15 L.Ed.2d 60: "[I]t is well-settled that absent a maritime status between the parties the traditional test of locality of the tort governs the question of whether maritime or state law is applicable. * * *"

11. It is interesting to note that in the Bournemouth case, the defendant conceded that "pollution of harbor waters obviously is a maritime tort which is within the admiralty jurisdiction of this court." 307 F.Supp. at 924. Similarly, in the case at bar, Harp Tanker does not attack this Court's jurisdiction.

12. *See* n. 1, *supra*, and accompanying text.

13. *See* n. 3, *supra*, and accompanying text.

with the fishings of every kind of fish * * *.' "

In Mayor and City Council v. Baltimore and Philadelphia Steamboat Company, 104 Md. 485, 65 A. 353 (1906), the Maryland Court of Appeals stated that: "It is well settled that, although the State is said to be the owner of the navigable waters within its boundaries, it holds them, not absolutely, but as a *quasi trustee* for the public benefit * * *." 104 Md. at 493–494, 65 A. at 356. Defendants contend that the "trusteeship" of the State is merely an expression of the State's power to regulate, and in support of this contention cite the Supreme Court decisions of Geer v. Connecticut, 161 U.S. 519, 16 S. Ct. 600, 40 L.Ed. 793 (1896) and Toomer v. Witsell, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 ·(1948), rehearing denied, 335 U.S. 837, 69 S.Ct. 12, 93 L. Ed. 389 (1948).

Geer v. Connecticut, *supra,* recognized that a state's right to preserve its natural resources "flows from the undoubted existence in the State of a police power" 161 U.S. at 534, 16 S.Ct. at 606. And in Toomer v. Witsell, *supra,* the Supreme Court said:

"The whole ownership theory, in fact, is now generally regarded as but a fiction expressive in legal shorthand of the importance to its people that a State have power to preserve and regulate the exploitation of an important resource. * * *" 334 U.S. at 402, 68 S.Ct. at 1165.

Similarly, the Court of Appeals of Maryland in Stevens v. State, 89 Md. 669, 43 A. 929 (1899), has discussed the State's interest in its natural resources in terms of its authority to regulate:

"The authorities agree that the ownership of all game animals and birds is in the people in their sovereign capacity, that is, in the State, and no individual has any property rights in game other than such as the State may permit him to acquire, and even when game has been captured and reduced into possession by the individual with the permission of the State, his ownership in it may be regulated and restrained by appropriate legislation. * * *" 89 Md. at 672–673, 43 A. at 930–931.

*See also* Corsa v. Tawes, 149 F.Supp. 771 (D.Md.1957), aff'd 355 U.S. 37, 78 S.Ct. 116, 2 L.Ed.2d 70.

▰ It is the defendants' position that the State, as a mere trustee of the waters contained therein, has no proprietary interest in said waters, and therefore is not able to bring a common law civil suit to redress a wrong done to the waters of the State. According to the defendants, if the State wishes to protect its natural resources, it must do so by enacting legislation pursuant to its police power. This power to regulate, it is maintained by the defendants, precludes the State from seeking relief in a court of law by alleging negligent injury to its waters.[14]

In view of this Court, the State's options in protecting a valuable natural resource cannot be so narrowly circumscribed. The Court has not been directed to and indeed is unaware of any rule of law which holds that the power of a state to legislate concerning a given matter precludes the state from bringing a common law suit to accomplish the same purpose and to redress the same wrong which a statute might seek to correct. This result would violate common sense; for if a state in order to best serve the public interest has the power to legislate regarding a given subject matter, does it not follow that the state

---

14. Defendants maintain that the failure of the State of Maryland to bring a common law suit such as the instant one in the past indicates, indeed is a tacit admission by the State, that it has never had the legal right to do so. The Court, however, believes that the State's failure to bring a suit such as this one may be ascribed to a delayed awareness of the importance of the problem, rather than to an absence of the right to do so. *See* Board of Public Works v. Larmar Corporation, 262 Md. 24, 56, 277 A.2d 427 (1971).

also has the inherent power to protect the public welfare by bringing common law suits which seek to attain the same result as that which legislation would seek to accomplish? In concluding that the State of Maryland does have such a right, the Court finds the language of Justice Frankfurter, concurring in Toomer v. Witsell, *supra*, most appropriate:

"A State may care for its own in utilizing the bounties of nature within her borders because it has *technical ownership* of such bounties or, when ownership is in no one, because *the State may for the common good exercise all the authority that technical ownership ordinarily confers*." 334 U.S. at 408, 68 S.Ct. at 1168 (emphasis added).

It is just this "technical ownership" that the State of Maryland has in its waters that gives it the legal right to bring suit on behalf of the public in order to serve the "common good" of its citizens. The conclusion seems inescapable to this Court, that if the State is deemed to be the trustee of the waters, then, as trustee, the State must be empowered to bring suit to protect the corpus of the trust—i. e., the waters—for the beneficiaries of the trust—i. e., the public.

In California, By and Through Dept. of Fish and Game v. S. S. Bournemouth, *supra*, the State of California brought an *in rem* action against the defendant vessel to recover damages which allegedly resulted from a discharge of a quantity of bunker oil into the navigable waters of California by the S. S. Bournemouth. The defendant moved to dismiss on the ground that as Sections 151 and 152 of the California Harbors and Navigation Code provide the State of California with an *in personam* remedy, the State would be precluded from bringing an *in rem* action which is not a statutory remedy. The district court disagreed and held that the State of California could bring an action *in rem* against the vessel *"as a matter of general maritime law without the aid or necessity of a statuto-ry lien."* 307 F.Supp. at 926 (emphasis added). The Court also said:

"The mere fact that Congress codifies a cause of action and provides a penalty creates no presumption of the nonexistence of similar rights at common law, here in the general maritime mon law, * * * but it is merely recognition of the significance a particular problem has in modern society." Id. at 929.

■ In upholding the State of Maryland's right to maintain the instant suit, this Court is not unmindful of the problems faced by the State of Maryland, and the other states of this country, as they engage in the daily battle to halt the pollution of their natural resources. For this Court to hold that unless a state has enacted legislation in the area of pollution control, it may not bring a common law suit to combat this problem, would be to unnecessarily tie the hands of the State in its war against pollution. This the Court will not do, for, as pointed out in California, By and Through Dept. of Fish and Game v. S. S. Bournemouth, *supra*:

"Oil pollution of the nation's navigable waters by seagoing vessels both foreign and domestic is a serious and growing problem. The cost to the public, both directly in terms of damage to the water and indirectly of abatement is considerable. In cases where it can be proven that such damage to property does in fact occur, *the governmental agencies charged with protecting the public interest have a right of recourse * * * against the offending vessel for damages to compensate for the loss."* 307 F.Supp. at 929 (emphasis added).

To this, the Court would only add that this right of recourse is available against *any* polluter, and hence, in the instant case, the State may seek relief from both the Amerada Hess Corporation and the Harp Tanker Corporation.

## NUISANCE

The State of Maryland has contended that the oil discharged into the waters

of the State of Maryland created a public nuisance and that the State has the right to seek damages for the cost of abating such nuisance. The State has sought compensation from both Amerada Hess Corporation [15] and Harp Tanker Corporation [16] for the cost of abating the alleged nuisance.

In response, both defendants maintain that one act does not create a nuisance, and that a nuisance necessarily involves the idea of continuance. The Court agrees.

■ It has been said that the "recurrence or continuance of the invasion is characteristic of nuisance," and that the doctrine of nuisance as developed by the American courts contemplates a continuing damage "rather than an isolated invasion of the plaintiff's interests." 1 F. Harper & F. James, The Law of Torts § 1.23 at 67 (1956). As the Maryland Court of Appeals has put it: "A nuisance necessarily involves the idea of continuance." Wynkoop v. Mayor and Council of Hagerstown, 159 Md. 194, 202, 150 A. 447, 450 (1930), followed in Burley v. Annapolis, 182 Md. 307, 313, 34 A.2d 603, 606 (1943). A review of the Maryland cases involving nuisances discloses that each case wherein a nuisance was found to exist contained the element of an ongoing phenomenon consisting of some recurring act or acts and/or a continuous condition.[17] This element of a continuing act resulting in a continuous condition is missing from the present case.

As an example of a one-time incident allegedly constituting a nuisance, the plaintiff points to Air Lift Ltd. v. Board of County Commissioners, 262 Md. 368,

278 A.2d 244 (1971), wherein a one-day rock festival was enjoined. The State contends that the rock festival was enjoined because it was found to constitute a public nuisance. Upon a close examination of the *Air Lift Ltd.* case, however, it can readily be seen that the injunction was based upon the failure of the proposed rock festival to comply with the zoning and regulatory requirements of Worcester County and not because the festival constituted a public nuisance.[18]

The State also argues that the cases of Caretti v. Broring Building Co., 150 Md. 198, 132 A. 619 (1926), and Neubauer v. Overlea Realty Co., 142 Md. 87, 120 A. 69 (1923), are authority for the proposition that "discharge of sewage into a stream has always been recognized as a nuisance." This Court is cognizant of the fact that a *continual discharge* of a noxious substance into a stream may create a nuisance which a riparian owner has the right to have abated.[19] It is quite another matter, however, to contend that the right of a riparian owner to restrain the continual discharge of sewage into a stream is authority for the assertion that a single act of pollution amounts to a common law nuisance and creates in a state the right to seek abatement of such a nuisance. The cases relied on by plaintiff cannot be read to go that far.

■ As additional support for the nuisance theory relied on by the plaintiff, it is stated that:

"Until recent years the great majority of oil pollution statutes and water pollution abatement statutes adopted throughout the country were primari-

---

15. Paragraph 6 of Count 1 of plaintiff's complaint.

16. Paragraph 6 of Count III of plaintiff's complaint.

17. *See, e. g.,* Washington Cleaners & Dyers, Inc. v. Albrecht, 157 Md. 389, 146 A. 233 (1929) ; Block v. Baltimore, 149 Md. 39, 129 A. 887 (1925) ; Singer v. James, 130 Md. 382, 100 A. 642 (1917) ; Longley v. McGeoch, 115 Md. 182, 80 A. 843 (1911).

18. "There is no statute which makes the holding of rock festivals illegal or a nuisance *per se* or even regulating the holding of them, as such, so that the holding of rock festivals or concerts is subject to the zoning, health, fire and police regulations applicable generally to such projects." 262 Md. at 394, 278 A.2d at 257.

19. This is actually what the cases relied on by the plaintiff establish.

ly based upon the concept that the state agency charged with safeguarding the waters of the state would take such action as necessary to abate nuisances." [20]

A sufficient answer to this theory is that the right of a state to enact legislation pursuant to its police power creating rights unknown at common law does not *a fortiori* give the state the ability and right to bring a common law action to attain the same result.[21] *See* Burley v. Annapolis, *supra*. As in the instant case, a single occurrence oil spill does not now and has never in the absence of legislation amounted to a common law nuisance, and the State may not maintain a civil action to abate such. There is, however, no reason why the State may not collect damages in a proper case.

### APPLICABILITY OF ARTICLE 96A, §§ 29B and 29D

As an alternative ground for relief, the State of Maryland has brought suit against both defendants pursuant to Article 96A, §§ 29B and 29D of the Annotated Code of Maryland.[22] Said statute was enacted by Chapter 243, Acts 1970, approved April 22, 1970, to take effect on July 1, 1970, and repealed former §§ 23–29 of Article 96A.[23]

Both defendants have moved to have the counts of plaintiff's complaint brought pursuant to this statute dismissed on the ground that the acts complained of allegedly occurred on or about April 15, 1970, before the enactment of the statute under which the state claims. The defendants maintain that this statute is to be applied prospectively only and can have no application to the instant suit. Plaintiff, on the other hand, contends that the statute should be applied retroactively as well as prospectively.

In Bell v. State, 236 Md. 356, 204 A.2d 54 (1964), the general rule regarding the prospective and/or retroactive operation of statutes was said to be the following:

"The general presumption is that all statutes, State and federal, are intended to operate prospectively and the presumption is found to have been rebutted only if there are clear expressions in the statute to the contrary. Retroactivity, even where permissible, is not favored and is not found, except

---

20. Plaintiff's Reply Memoranda, p. 5, directed to Harp Tanker's Motion to Dismiss.

21. The fact that the Court has previously ruled that the State's right to legislate concerning the matter of pollution to its waters does not preclude the state from bringing a common law suit to redress the same wrong, is not at variance with its present ruling that the ability of the State to designate a one-time occurrence a nuisance does not indicate that the state can bring suit at common law based on the theory that a single occurrence amounts to an actionable nuisance. The reason is that negligence had always been a basis for common law suits, whereas a single occurrence has never constituted a nuisance at common law. Thus, in one instance the state has merely codified a right which, in some form, has previously existed at common law; in the other instance, the state has created by statute a right unknown at common law.

22. Paragraphs 2 and 3 of Count II state a cause of action against Amerada Hess.

Paragraphs 2 and 3 of Count IV state a cause of action against Harp Tanker.

23. Section 29B provides that the Maryland Port Authority and the Department of Natural Resources shall charge and collect a compensatory fee from the person responsible for the oil spillage to "cover the cost of labor, equipment operation, and materials necessary to eliminate the residue of oil spillage * * *." Section 29D, subsection (a) charges the Department of Natural Resources with the responsibility of requiring the "repair of any damage done and the restoration of water resources to a degree necessary to protect the best interests of the people of the State;" subsection (b) states that the Attorney General, upon the recommendation of the Department of Natural Resources, "shall file suit against the person or persons causing the condition complained of, who shall be jointly and severally liable for the reasonable cost of rehabilitation and restoration of the resources damaged and the cost of eliminating the condition causing the damage."

upon the plainest mandate in the act. * * * " 236 Md. at 369, 204 A.2d at 61.

And in Unsatisfied Claim and Judgment Fund Board v. Bowman, 249 Md. 705, 241 A.2d 714 (1968), the Maryland Court of Appeals, when confronted with the issue of the application of Chapter 81 of the Laws of 1964, quoted the general rule and went on to say (at p. 708, 241 A.2d at p. 716): "We need not, however, rely only on the general rule, for the cardinal rule of statutory construction is that the courts should ascertain the legislative intent * * * and give that intention effect. * * * " In concluding that the legislative intent was that Chapter 81 should be given prospective application only, stress was placed upon the fact that Chapter 81 was to take effect on a future date and that the future date was one other than that prescribed by § 31 of Article III of the Constitution of Maryland which states that laws passed by the General Assembly shall take effect on the June 1 following the date of enactment.

 Applying these principles to the instant case, it is clear that §§ 29B and 29D are to receive prospective application only. Chapter 243, Acts 1970, was approved on April 22, 1970, and declared that the statute was to become effective as of July 1, 1970, a date other than that called for in § 31 of Article III of the Maryland Constitution. The Court finds this to be a definite indication by the legislature of Maryland that Sections 29B and 29D of Article 96A were to operate prospectively and not retroactively. Furthermore, there are no "clear expressions" in the statute which would indicate a contrary intent on the part of the legislature and therefore suggest to the Court that it should deviate from the general rule that all statutes are

presumed to operate prospectively. Accordingly, the Court is of the opinion that Sections 29B and 29D of Article 96A of the Annotated Code of Maryland, are to receive prospective application only and therefore were not in effect at the time of the acts complained of in this suit.

## SEAWORTHINESS OF VESSEL

Count V of the Complaint alleges that "solely by reason of the unseaworthiness of [the S. S. Kadmos], the waters of the State of Maryland have been polluted and have been irreparably damaged." Contending that Harp Tanker had a duty to provide the State of Maryland with a seaworthy vessel, plaintiff, in Count V, seeks relief from that defendant. Harp Tanker moves to have this count of the Complaint dismissed on the ground that it "owes no duty to the plaintiff to provide a seaworthy vessel."

The plaintiff, although conceding that the warranty of seaworthiness has traditionally been limited to the privity of contract situation or has run to the benefit of those performing the historical functions of seamen,[24] argues that this doctrine should be extended in order to impose on a ship and its owner the absolute duty to provide the State and its waters with a seaworthy vessel.[25]

The absolute duty to provide a seaworthy vessel to seamen was established by the Supreme Court in The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903). The duty was extended to longshoremen and maritime workers performing the historical functions of seamen in Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), where the Supreme Court, after discussing some of the dangers encountered by seamen, concluded:

24. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946).

25. Such a duty after July 1, 1974 may be owing to the United States under "Rules and Regulations for Protection of the Marine Environment Relating to Vessel Design and Construction, Alteration and Repair" passed pursuant to the Ports and Waterways Safety Act of 1972, Public Law 92–340, 92nd Congress, July 10, 1972, 86 Stat. 424.

"These and other considerations arising from the hazards which maritime service places upon men who perform it, rather than any consensual basis of responsibility, have been the paramount influences dictating the shipowner's liability for unseaworthiness as well as its absolute character. It is essentially a species of liability without fault, analogous to other well known instances in our law. Derived from and shaped to meet the hazards which performing the service imposes, the liability is neither limited by conceptions of negligence nor contractual in character. * * * It is a form of absolute duty owing to all within the range of its humanitarian policy." 328 U.S. at 94–95, 66 S.Ct. at 877.

The reasoning of the *Sieracki* case clearly indicates that the absolute duty to provide a seaworthy vessel is derived from and shaped to meet the hazards which seamen encounter in the daily performance of their duties. It is a form of absolute liability imposed upon vessels in order to insure that seamen are adequately protected from the dangers they encounter in their employment. These same exigencies do not exist in the case at bar. The relationship of the defendant Harp Tanker and the State of Maryland does not entail the type of hazards and is not such as would necessitate imposing upon the defendant the duty of having to provide the State of Maryland with a seaworthy vessel. This Court knows of no case where such a duty has been imposed upon a seagoing vessel, and the Court has no intention of extending the coverage of the doctrine of seaworthiness so as to encompass a situation where, as in the case at bar, an oil spill is alleged to have occurred in the waters of a state due to the actions of a vessel. Plaintiff's cause of action stated in Count V is, therefore, held to be without merit.

For the foregoing reasons, there is being filed with this opinion an Order of this Court denying in part and granting in part the Motion to Dismiss of Amerada Hess Corporation, denying in part and granting in part the Motion to Dismiss of Harp Tanker Corporation, and directing the plaintiff to file an Amended Complaint.