**STATE of CALIFORNIA, BY AND THROUGH its DEPARTMENT OF FISH AND GAME, Plaintiff,**

**v.**

**S.S. BOURNEMOUTH, Lloyds Registry Number 516-2504, Official Number 720, her engines, tackle, apparel, furniture and equipment, Defendant.**

Civ. No. 69-1994-F.

United States District Court
C. D. California.

Dec. 18, 1969.

Thomas C. Lynch, Atty. Gen., David B. Stanton, Deputy Atty. Gen., Los Angeles, Cal., for plaintiff.

Lillick, McHose, Wheat, Adams & Charles, Michael D. Dempsey, Los Angeles, Cal., for defendant.

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS

FERGUSON, District Judge.

The plaintiff, State of California, by and through its Department of Fish and Game, filed a complaint in rem against the vessel S.S. Bournemouth to recover damages incurred by discharging a quantity of bunker oil into the navigable waters of the State of California and of the United States.

The complaint alleges that the S.S. Bournemouth (hereinafter called "Bournemouth") is a ship of the Liberian Flag, Lloyds Registry Identification Number 516–2504, Official Number 720, owned and operated by Bournemouth Shipping Company, Monrovia, Liberia, and presently under charter to States Marine Lines, Inc., a Delaware corporation.

The acts complained of allegedly occurred on or about October 3, 1969, while the Bournemouth was moored in the navigable waters at Long Beach, California, Berth 10, Pier A, to discharge cargo. Plaintiff seeks relief in the form of damages to compensate for injury to property arising out of pollution to the water and for costs of abatement.

The Bournemouth, while lying at anchor at Berth 10, Pier A, Long Beach, California, was seized, arrested and taken into possession October 5, 1969, by the United States Marshal for the Central District of California subject to a warrant for arrest in an action in rem.

**924**

A bond was posted, and the Bournemouth was permitted to leave the United States.

■ The defendant made a restricted appearance under Admiralty and Maritime Claims Rule E(8) and moved to dismiss for lack of jurisdiction over the subject matter, lack of jurisdiction over the vessel, and failure to state a cause of action. The defendant's motion is premised on the belief that the plaintiff acted solely under authority granted in Sections 151 and 152 of the California Harbors and Navigation Code,* which both parties concede does not provide for a remedy in rem. Defendant urges that since Section 151 does not provide for a lien or privilege upon the offending thing, the plaintiff is not entitled to proceed in rem, but is entitled to prosecute the matter only by obtaining in personam jurisdiction over the owners of the vessel. The motion correctly asserts, and it is not contested by plaintiff, that a maritime lien is a necessary condition to a suit in rem in admiralty. The Duchess, 15 F.2d 198, 199 (E.D.N.Y. 1926), The Resolute, 168 U.S. 437, 440, 18 S.Ct. 112, 42 L.Ed. 533 (1897).

Plaintiff in opposition to the motion to dismiss points out that the complaint contained no mention of the California Harbors and Navigation Code. Plaintiff urges instead, that the act of causing oil to be placed in the navigable waters of the State is a maritime tort: (1) within the admiralty jurisdiction of the United States pursuant to 46 U.S.C. § 740; and (2) states a cause of action long recognized by admiralty courts without the existence of a statute.

### The Statutory Basis

Defendant, in reply to plaintiff's opposition to the motion to dismiss, agrees with plaintiff that 46 U.S.C. § 740 is applicable, conceding that "pollution of harbor waters obviously is a maritime tort which is within the admiralty jurisdiction of this court". This court has jurisdiction pursuant to 28 U.S.C. § 1333(1). Defendant argues, however, that jurisdiction under 46 U.S.C. § 740 as applied to the facts of this case, is in personam and not in rem, requiring the court to dismiss for want of jurisdiction over the vessel in the absence of a maritime lien to support this action.

Both parties, however, are in error in relying on 46 U.S.C. § 740. The statute, designated the Extension of Admiralty Jurisdiction Act, provides:

"The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, *notwithstanding that such damage or injury be done or consummated on land* (emphasis added).

"In any such case suit may be brought in rem or in personam according to the principles of law and the rules of practice obtaining in cases

---

* **§ 151.** *Oil deposits; civil penalty; damages*

Except where permitted pursuant to the provisions of Chapter 4 (commencing with Section 13040) of Division 7 of the Water Code, any person that intentionally or negligently causes or permits any oil to be deposited in the water of this state, including but not limited to navigable waters, shall be liable civilly in an amount not exceeding six thousand dollars ($6,000) and, in addition, shall be liable to any governmental agency charged with the responsibility for cleaning up or abating any such oil for all actual damages, in addition to the reasonable costs actually incurred in abating or cleaning up the oil deposit in such waters. The

amount of the civil penalty which is assessed pursuant to this section shall be based upon the amount of discharge and the likelihood of permanent injury and shall be recoverable in a civil action by, and paid to, such governmental agency. If more than one such agency has responsibility for the waters in question, the agency which conducts the cleaning or abating activities shall be the agency authorized to proceed under this section."

"**§ 152.** *Oil deposit; notice by agency cleaning up*

The agency cleaning up the oil deposit shall notify, in writing, the appropriate regional water quality control board of the nature of the deposit and of the corrective action taken or contemplated."

where the injury or damage has been done and consummated on navigable water: *Provided,* That as to any suit * * * for damage or injury done or consummated on land by a vessel on navigable waters, * * *."

While the Constitution of the United States establishes that the federal judicial power extends to "all Cases of admiralty and maritime Jurisdiction" the boundaries of that jurisdiction were left to the courts to define. Historically, the single most important factor in determining whether a tort was within the scope of the admiralty court's jurisdiction was the situs of the occurrence. In The Plymouth, 3 Wall. 20, 70 U.S. 20, 33–34, 18 L.Ed. 125 (1865), the Court stated:

"In the case of Thomas v. Lane [23 Fed.Cas. No.13,902, 957], Mr. Justice Story, in a case where the imprisonment was stated in the libel to be on shore, observed: 'In regard to torts, I have always understood that the jurisdiction of the admiralty is exclusively dependent upon the locality of the act. The admiralty has not, and never, I believe, deliberately claimed to have, any jurisdiction over torts, except such as are maritime torts; that is, torts upon the high seas, or on waters within the ebb and flow of the tide.' Since the case of the Genessee Chief [12 How. 443, 13 L.Ed. 1058], navigable waters may be substituted for tide waters. This view of the jurisdiction over maritime torts has not been denied."

The Court, in The Plymouth, *supra,* at 36, also stated as dictum that the jurisdiction of the admiralty over maritime torts does not depend upon the wrong having been committed on board the vessel, but upon its having been committed upon the high seas or other navigable waters.

Strict application of the locality rule has often resulted in obvious inequities. Actions in tort for damages to a bridge, The Troy, 208 U.S. 321, 28 S.Ct. 416, 52 L.Ed. 512 (1908); to a pier, The Cur-tin, 152 F. 588 (E.D.Pa.1907); or to a building struck by a vessel, Johnson v. Chicago & Pacific Elev. Co., 119 U.S. 388, 7 S.Ct. 254, 30 L.Ed. 447 (1886), for example, as extensions of the land, have historically been held not within the maritime jurisdiction. As a consequence, while the vessel could bring an action in admiralty for damages, and benefit from the substantive and procedural advantages peculiar to admiralty jurisdiction, the owner of the land-based property had no recourse for relief but to the local law of the place of the injury.

▪ Adoption of the Extension of Admiralty Jurisdiction Act (46 U.S.C. § 740) was intended to modify the traditional rule that tort jurisdiction in admiralty did not embrace damage consummated on land. The legislative history clearly indicates that the Act makes available a concurrent remedy in admiralty for the existing common-law action. No new cause of action was contemplated by Congress in passing the Act; rather those causes of action which the cases have termed "ship-to-shore" torts now have a new form of relief available in admiralty. Fematt v. City of Los Angeles, 196 F.Supp. 89 (S.D. Cal.1961); United States v. Matson Nav. Co., 201 F.2d 610 (9th Cir.1953); Nacirema Co. v. Johnson, 396 U.S. 212, 220–223, 90 S.Ct. 347, 353–354, 24 L.Ed. 2d 371, 379–380 (1969).

▪ In the complaint filed by the plaintiff, State of California, no injury caused by a vessel on navigable water, "done or consummated on land" was alleged. Here, the injury was to the water itself and presumably the marine life therein. It appears that reliance on 46 U.S.C. § 740 is unwarranted and misplaced. Another basis must therefore be found to exist in order to bring this type of action within the admiralty jurisdiction of the United States and subject the Bournemouth to in rem jurisdiction in this court. Otherwise, the plaintiff would be left with common-law

remedies in personam against the owners of the vessel only.

### The Maritime Tort Basis

■ Plaintiff alternatively urges that injury caused by oil pollution to its navigable waters states a maritime cause of action giving rise to a maritime lien and a suit in rem in admiralty independent of any statute. Defendant, on the other hand, contends that not every maritime tort results in a maritime lien, which lien both parties agree is a condition precedent to an action in rem. Defendant takes the position that only two types of maritime torts create maritime liens: collision claims and personal injury claims.

The issue before the court in ruling on defendant's motion to dismiss is therefore a narrow one. Stated simply, the issue is whether the tort of injury to plaintiff's property (navigable waters and marine life) will give rise to a maritime lien and thereby support an admiralty action in rem against the Bournemouth.

The court finds no merit in defendant's position and is of the opinion that the tort in question is maritime in nature; that a maritime lien against the Bournemouth arises in favor of the plaintiff which will support an admiralty action in rem, as a matter of general maritime law without the aid or necessity of a statutory lien.

The general proposition advanced by defendant that not every maritime tort results in a maritime lien is not established by the cases cited by defendant in support of the proposition. The Westmoor, 27 F.2d 886 (D.Or.1928), denied the existence of a maritime lien but in a case involving wrongful death resulting from the master's acts. No injury was caused by the vessel, and the court stated, at 887, it could not be said to be "in substance either the contracting or offending thing". The action was also brought in reliance on a state statute and not under the general maritime law. In The Albert Dumois, 177 U.S. 240,

20 S.Ct. 595, 44 L.Ed. 751 (1900), on which the defendant also relies, the cause of action was for wrongful death caused by a collision. The Steamer St. Lawrence, 1 Black. 522, 66 U.S. 522, 17 L.Ed. 180 (1862), was a case where suit was brought on a contract and involved the question of a lien for supplies. The other cases cited by defendant [The Harrisburg, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358 (1886); Andrade v. United States, 107 F.Supp. 463 (D.R.I.1952); State, to Use of Maines v. A/S Nye Kristianborg, 84 F.Supp. 775 (D.Md.1949); Welsh v. The North Cambria, 40 F. 655 (E.D.Pa. 1889); and The Sylvan Glen, 9 F. 335 (E.D.N.Y.1881)] all involved actions for wrongful death.

The courts have long recognized that suits for wrongful death do not lie in admiralty whether in personam or in rem under the general maritime law; they can be brought only by benefit of a statute. The right of action dies with the person consistent with the rule of the common law, and such cases are therefore inapposite to defendant's contention. The Corsair, 145 U.S. 335, 12 S.Ct. 949, 36 L.Ed. 727 (1892), and La Bourgogne, 210 U.S. 95, 28 S.Ct. 664, 52 L.Ed. 973 (1908).

The court acknowledges the fact that the great bulk of maritime tort litigation involving suits in rem which hold that a maritime lien arises against the vessel falls within the two broad categories: collision claims and personal injury claims, suggested by defendant. The cases do not, however, support the view that these categories are all inclusive or that the tort liability of a vessel for its unlawful acts should be so limited. Nor can the court find support in any public policy or set of reasons advanced by defendant for so limiting maritime liens.

To give rise to a lien a claim must be in the first instance maritime. A number of cases and writers criticize the validity of the traditional locality test applied to maritime torts as being too narrow. It is nonetheless an adequate test on the facts of the instant case.

While legislative "extensions of the admiralty tort jurisdiction" give tacit recognition to the proposition that the scope of the jurisdiction should logically depend on a relationship to maritime commerce generally, rather than on any fixed reliance on the situs of the injury, the tort complained of here occurred on the navigable waters of the State of California and is maritime in nature. The Plymouth, *supra.*

The court takes judicial notice of the cases cited by defendant to the effect that a maritime lien is a secret one, stricti juris, which cannot be extended by construction, analogy, or inference [The Pinar Del Rio, 277 U.S. 151, 48 S.Ct. 457, 72 L.Ed. 827 (1928), The Aljohn, 7 F.Supp. 788 (E.D.N.Y.1934)] and distinguishes the present case on the grounds that a maritime lien for tortious damage to property is not an extension of the general maritime law, but has long been sanctioned by the cases. In The Rock Island Bridge, 6 Wall. 213, 73 U.S. 213, 215, 18 L.Ed. 753 (1867), Mr. Justice Field said:

"There is no doubt, * * * that the jurisdiction of the admiralty extends to all cases of tort committed on the high seas, and in this country on navigable waters. For the redress of these torts, the courts of admiralty may proceed *in personam,* and when the cause of the injury is the subject of a maritime lien, may also proceed *in rem.* The latter proceeding is the remedy afforded for the enforcement of liens of that character.

"A maritime lien, unlike a lien at common law, may, in many cases, exist without possession of the thing, upon which it is asserted, either actual or constructive. * * * and when the lien arises from torts committed at sea, it travels with the thing, wherever that goes, and into whosoever hands it may pass. The only object of the proceeding *in rem,* is to make this right, where it exists, available—to carry it into effect. It subserves no other purpose.

"The lien and the proceeding *in rem* are, therefore, correlative—where one exists, the other can be taken, and not otherwise. Such is the language of the Privy Council in the decision of the case of The Bold Buccleugh. 'A maritime lien', says that court, 'is the foundation of the proceeding *in rem,* a process to make perfect a right inchoate from the moment the lien attaches; and whilst it must be admitted that where such lien exists a proceeding *in rem* may be had, it will be found to be equally true, that in all cases where a proceeding *in rem* is the proper course, there a maritime lien exists, which gives a privilege or claim upon the thing to be carried into effect by legal process'."

Mr. Justice Story had an equally broad view of the compass of admiralty jurisdiction with regard to maritime torts. In De Lovio v. Boit, 7 Fed.Cas.No.3776, 418, 444 (C.C.D.Mass.1815), he stated:

"On the whole, I am, without the slightest hesitation, ready to pronounce that the delegation of cognizance of 'all civil cases of admiralty and maritime jurisdiction' to the courts of the United States comprehends *all maritime* contracts, *torts,* and injuries" (emphasis added).

A maritime tort involving no accident, and mere injury to property, is obviously out of the ordinary; collision and personal injury suits are common. But relative frequency of occurrence is not a reasonable standard by which an admiralty court will determine the range of appropriate remedies for various types of maritime torts. A number of cases recognize a maritime lien for injury to property by conversion.

In The Escanaba, 96 F. 252 (N.D.Ill. 1899), the conversion by the master of the vessel of goods shipped thereon constituted a tort and the claim therefor by the owners of the goods against the vessel was given preference over liens for supplies furnished prior to the tort. In The Atlanta, 82 F.Supp. 218 (S.D.Ga. 1948), the court held that a lien existed

against the vessel for such tortious damages as conversion of property by the unauthorized use of a lighter by the ship's crew. Also, in The Lydia, 1 F.2d 18 (2d Cir. 1924), where the libelant delivered •coal to the vessel, the master after demand refused to issue a bill of lading therefor, departed with the coal and later disposed of it, the court, at page 23, stated: "Suit in rem for conversion is by no means unknown to the admiralty nor to this court. * * * The reason for the exercise of admiralty jurisdiction is that conversion is a tort, * * * and if that tort is committed on navigable waters, admiralty has jurisdiction."

In The Washington, 296 F. 158, 166–167 (E.D.N.Y.1924), a case which involved no collision or personal injury, the court said:

"The Commissioner has found that Chapis [a seaman and one of the libelants] has a lien (prior to any lien for supplies furnished) for goods belonging to him which were lost. The ship was libeled, he demanded his goods, they could not be or were not found, and he has been damaged in an amount equal to their value. They may have been sold with the ship. At any rate, they belonged to Chapis, were lawfully aboard the boat, have disappeared without fault on his part, and under circumstances which amount to a tort. * * * Under the authorities, he was properly allowed a maritime lien for the loss thereof."

And, in The Minnetonka, 146 F. 509 (2d Cir. 1906), cert. denied, 203 U.S. 589, 27 S.Ct. 777, 51 L.Ed. 330 (1906), a passenger brought an action against the vessel to recover for the value of jewelry stolen during the voyage by an employee of the vessel. The court, with no attempt being made to distinguish conversion from other types of torts, said, at page 513, "the liability of the vessel for the willful torts of its own servants committed upon a passenger during the voyage is well established".

The Fourth Circuit has commented on the scope of in rem suits for maritime torts in a case involving personal injury, The Anaces, 93 F. 240, 241 (4th Cir. 1899), as follows:

[Under Admiralty Rules then in force] " * * * Admiralty rule 23 provides that:

'all libels in instance causes, civil or maritime, shall state the nature of the cause; as, for example, that it is a cause, civil and maritime, of contract, or of tort or damage, or of salvage, or of possession or otherwise, as the case may be; and, if the libel be in rem, that the property is within the district * * *.'

"The only action for tort which by express rule is forbidden to be brought in rem is that mentioned in rule 16, which declares that all suits for assaults and beating on the high seas, or elsewhere within the admiralty and maritime jurisdiction, shall be in personam only. * * * "

*Conclusion*

It is the view of this court that the general maritime law has consistently provided in rem relief to the owner of property tortiously damaged by conversion while such property is upon the navigable waters. While here the alleged injury was to the water itself, and possibly the marine life also, efforts to distinguish between various types of injury which may occur to various types of property would serve no useful purpose. Appropriate to such an exercise would be the language of Judge Morris of the Fourth Circuit in The Anaces, *supra*, at 244, in which case an attempt was made by the defendant, not unlike the one made here by the defendant, to distinguish between kinds of tortious conduct in specific instances from tortious conduct in general:

"Every consideration of justice and of convenience urges that the maritime lien, if it exists, should be maintained in cases like the present one. The owners of the vessel almost invariably are unknown and inaccessible. To require the libelant to serve proc-

ess on them is practically to deny him any remedy. Under the statutes of the United States, the owners of all the vessel property, foreign and domestic, are given, to the fullest extent, the privilege of limiting their liability to the value of their interest in the vessel. The injured party cannot touch their property, outside of their interest in the ship, if they claim to limit their liability; and there are strong reasons of justice and convenience why he should have a maritime lien upon that specific property, and why distinctions, not founded in reason, between claims of the same general merit, should not gain a place in a system of jurisprudence which is intended to approach natural justice."

In the instant case it is admitted by defendant's counsel that the owners of the Bournemouth are not present and subject to personal service of process. It is further admitted that the vessel's present schedule does not call for her to return to the United States. The injury to property alleged to have been caused by defendant in discharging bunker oil into the navigable waters of the State of California is the basis for a claim of the same general merit as any conversion of property historically recognized by the general maritime law and is protected by the creation of a maritime lien.

Oil pollution of the nation's navigable waters by seagoing vessels both foreign and domestic is a serious and growing problem. The cost to the public, both directly in terms of damage to the water and indirectly of abatement is considerable. In cases where it can be proven that such damage to property does in fact occur, the governmental agencies charged with protecting the public interest have a right of recourse in rem against the offending vessel for damages to compensate for the loss.

█ As a final basis and authority for the proposition that pollution of California's navigable waters by the Bournemouth created no maritime lien, defendant cites a bill to amend the Feder-

al Water Pollution Control Act, H.R. 4148, 91st Cong., 1st Sess. (1969), recently passed by the United States House of Representatives. Section 17 (e) (1) of the bill expressly provides for a lien against a vessel for damage arising out of oil pollution to the navigable waters of the United States. The offending vessel would be liable in rem for the costs of abatement. The position of the defendant, in effect, is that if a maritime lien already existed for this type of damage the House would not have written a lien into the bill. This argument is without merit in light of existing federal statutes, 33 U.S.C. §§ 433 and 434, which provide penalties for liability to the United States, including a lien in an action in rem against a vessel which discharges oil into the navigable waters of the United States. In 1966, Congress amended the Oil Pollution Act, 1924, for the purpose of expanding and providing incentives to curtail water pollution and to provide penalties to meet the costs of abatement. The original Act was designed primarily to protect the nation's coastal waters against pollution discharge from vessels. The 1966 amendments (Clean Water Restoration Act) extended the application of the 1924 Act to navigable and interstate as well as coastal waters and the adjoining shorelines. Oil discharges were prohibited not only from vessels but from boats, shore installations, and terminal facilities. The Oil Pollution Act, 1924, expressly provided that the statutory provisions were "in addition to the existing laws for the preservation and protection of navigable waters of the United States and shall not be construed as repealing, modifying, or in any manner affecting the provisions of these laws". The mere fact that Congress codifies a cause of action and provides a penalty creates no presumption of the nonexistence of similar rights at common law, here in the general maritime law, but is merely recognition of the significance a particular problem has in modern society.

For the reasons indicated, the motion to dismiss is denied.

It is further ordered that the clerk this date shall serve copies of this order by United States mail upon the attorneys for the parties appearing in this action.