UNITED STATES

v.

**BEAR MARINE SERVICES et al.**

Civ. A. No. 79–3331.

United States District Court,
E. D. Louisiana.

Dec. 18, 1980.

Leonard P. Avery, Asst. U. S. Atty., New Orleans, La., Thomas W. Snook, T.A., Torts Branch-Civil Division, U. S. Dept. of Justice, Washington, D. C., for the United States.

Henry J. Read, Machale A. Miller, Montgomery, Barnett, Brown & Read, New Orleans, La., Sheldon A. Vogel, Bigham, Englar, Jones & Houston, New York City, for Consolidated Towing Co. and Bear Marine Towing.

Francis Emmett, New Orleans, La., for Bear Marine Towing.

William E. O'Neil, Mark L. Ross, Lemle, Kelleher, Kohlmeyer & Matthew, New Orleans, La., for International Matex Terminals.

ARCENEAUX, District Judge.

Exerting a purely maritime claim, the United States seeks to recover oil clean-up costs from International Matex Tank Terminal ("IMTT"). The costs were incurred when a barge, in the tow of the Tug Frances Twitty and owned by Bear Marine Services, was holed when it struck a dolphin owned by IMTT. IMTT moved to dismiss the claim, asserting the exclusivity of the Federal Water Pollution Control Act, as amended by the Water and Environmental Quality Improvement Act of 1970, P.L. 224 of the 91st Congress, 84 Stat. 91, amended and recodified at 33 U.S.C. §§ 1251–1376 (hereinafter referred to for convenience as the "F.W.P.C.A."). The government resists the motion, asserting that Subsection (h) of the Act (33 U.S.C. § 1321) affords to the Government a maritime tort-based remedy under the circumstances present here.

## THE ISSUE PRESENTED

The narrow issue before the Court is: Does the United States have a right, either implicit in the F.W.P.C.A. or independent of it, to bring a negligence action under general maritime law to recover oil spill clean-up costs, or, are the statutory remedies with their limited recovery provisions exclusive?

To answer this question, the Court must look to the statute itself, 33 U.S.C. § 1321, accompanying legislative history, and any case law which might be illuminative.

There are three areas of the statute relevant to our present inquiry; all lodged in 33 U.S.C. § 1321—Subsections (f), (g) and (h). But stating the focus of the possible source of resolution accomplishes nothing towards solving the problems of interpretation presented. The task of unravelling the statutory scheme is complicated by the drafters' lack of clarity and the generally obfuscated nature of the structure within which the two Houses of the Congress have chosen to lodge the product of their respective wills. The statute was essentially drafted by a Conference Committee which had before it two separate legislative approaches to the problem of governmental recovery of oil clean-up costs. The resultant statutory product reflects the "give and take" of the legislative process, and the imprecision of group-undertaken drafting. While neither the language of the Act itself nor the accompanying legislative history is dispositive of the issues presented, it is the task of this Court to discover the Congressional intent, using the devices available to us—the language of the Act, its legislative history, and the process of statutory construction. We must also look to the time frame in which the statute was enacted, for the events of history often color the tapestries of legislation.

The 1960's had seen the advent of the super tanker; at the same time, our nation, growing more conscious of the need for a clean environment, sought to devise means of maintaining ecological balance in the face of constantly increasing threats of environmental damage, particularly to the waters of the United States and its adjacent coastal waters.

The magnitude of the problem had outstripped the viability of available legal remedies, particularly the traditional concept of the maritime tort. The ultimate problem of a discharger's financial inability to pay even minimal amounts of the often-vast sums required to clean up the results of an oil spill required a fresh legislative response. Against this background, the 1970 Amendments to the F.W.P.C.A. became law.

The Act represents a compromise between competing interests which, on the one hand, demanded unlimited liability for dischargers whose proven fault caused water pollution, and those which, on the other hand, would have imposed liability subject to a reverse burden of proof to show lack of fault.[1] From these two competing concepts there emerged, by way of the Conference Committee, the present legislative scheme which, in essence, imposes liability to the United States for clean-up costs upon a discharger without the necessity of proving fault, but limits the recovery to certain tonnage formulae amounts, set forth in the statute, unless certain conditions are met which, if present, can produce unlimited liability.

In addition, the law provides for certain instances when no liability shall be imposed, such as discharges resulting from an act of God, or an act of war, etc.

The statute is applicable not only to discharges from vessels, but also to discharges from certain offshore and onshore facilities. However, since the facts now before us involve vessel-originating discharges, we shall deal with the issues presented by referring to "vessels" as the discharging entity, realizing that, in appropriate circumstances, the rationale of these findings may be pertinent to the other classes of discharge sources contemplated by the statute.

We also approach this task with an additional caveat. This opinion does not purport to deal with matters beyond those

---

1. As this circuit has observed, the F.W.P.C.A. "represents a compromise between the two proposed statutes." *United States v. Dixie Carriers, Inc.,* 627 F.2d 736, 739 (5th Cir. 1980). *See also* Comments of Rep. Cramer, Cong.Rec. House, Mar. 25, 1970, at 9327.

presented by the pending motion, and, while certain factual conclusions may perhaps be intimated from the discussion which follows, this opinion is limited to the legal issues which are herein determined. This Court is dealing solely with the interpretation and applicability of the statute vis-a-vis the defendant's motion to dismiss, and nothing contained herein is determinative of any factual issues inherent in the pending suit.

## HOW THE STATUTE WORKS

### I. Generally

The thrust of the statute comprised, as we have previously stated, of three essential subsections—(f), (g) and (h)—is, first, towards the discharging entity; that is, the fact of a discharge automatically produces statutory liability, which is visited upon the owner or operator of the discharging vessel —(f)(1), onshore facility—(f)(2), or offshore facility—(f)(3).

### II. Subsection (f)

■ When a vessel is the source of a discharge of oil, its owner or operator becomes strictly liable for the cost of clean-up, as limited by the tonnage formulae established in the Act.[2] Four exceptions, set forth in the statute, allow a discharger to absolve itself of liability, but these exceptions are based upon some other party or

---

2. Subsection (f) provides:

(f)(1) Except where an owner or operator can prove that a discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party without regard to whether any such act or omission was or was not negligent, or any combination of the foregoing clauses, such owner or operator of any vessel from which oil or a hazardous substance is discharged in violation of subsection (b)(3) of this section shall, notwithstanding any other provision of law, be liable to the United States Government for the actual costs incurred under subsection (c) of this section for the removal of such oil or substance by the United States Government in an amount not to exceed, in the case of an inland oil barge $125 per gross ton of such barge, or $125,000, whichever is greater, and in the case of any other vessel, $150 per gross ton of such vessel (or, for a vessel carrying oil or hazardous substances as cargo, $250,000), whichever is greater, except that where the United States can show that such discharge was the result of willful negligence or willful misconduct within the privity and knowledge of the owner, such owner or operator shall be liable to the United States Government for the full amount of such costs. Such costs shall constitute a maritime lien on such vessel which may be recovered in an action in rem in the district court of the United States for any district within which any vessel may be found. The United States may also bring an action against the owner or operator of such vessel in any court of competent jurisdiction to recover such costs.

(2) Except where an owner or operator of an onshore facility can prove that a discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party without regard to whether any such act or omission was or was not negligent, or any combination of the foregoing clauses, such owner or operator of any such facility from which oil or a hazardous substance is discharged in violation of subsection (b)(3) of this section shall be liable to the United States Government for the actual costs incurred under subsection (c) of this section for the removal of such oil or substance by the United States Government in an amount not to exceed $50,000,000, except that where the United States can show that such discharge was the result of willful negligence or willful misconduct within the privity and knowledge of the owner, such owner or operator shall be liable to the United States Government for the full amount of such costs. The United States may bring an action against the owner or operator of such facility in any court of competent jurisdiction to recover such costs. The Administrator is authorized, by regulation, after consultation with the Secretary of Commerce and the Small Business Administration, to establish reasonable and equitable classifications of those onshore facilities having a total fixed storage capacity of 1,000 barrels or less which he determines because of size, type, and location do not present a substantial risk of the discharge of oil or a hazardous substance in violation of subsection (b)(3) of this section, and apply with respect to such classifications differing limits of liability which may be less than the amount contained in this paragraph.

(3) Except where an owner or operator of an offshore facility can prove that a discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party without regard to whether any such act or omission was or was not negligent, or any combination

event being the *sole cause* of the discharge. The legislative history makes it clear that the exceptions are to be strictly construed and that they must, in fact, be *sole* causes of the discharge. The discharger must be totally free of fault; any fault on the part of the discharger vitiates the "sole cause" exceptions.[3] Further, should it be found that a discharge was the result of *willful* negligence or *willful* misconduct within the privity and knowledge of the owner, such owner or operator becomes liable to the Government for the full costs of clean-up, without benefit of the otherwise applicable statutory limitations.

## III. Subsection (g)

Consistent with Subsection (f)'s applicability to the discharger is Subsection (g), which extends the same statutory scheme to a third party when a discharger effectively proves that such third party was the *sole* cause of the discharge. *United States v. LeBeouf Bros. Towing Co.*, 621 F.2d 787 (5th Cir. 1980). As noted above, Subsection (f) allows a discharger to escape liability if it can show that some other party, act or event was the sole cause of the spill; there can be no fault, *however slight*, on the part of the discharger. This same "escape route" is available to a Subsection (g) third party. Thus, if a third party can establish that one of the enumerated exceptions was the *sole* cause of the discharge, then such third party is likewise absolved of liability.

The respective limitations on liability made applicable to a discharger are likewise applicable to a "sole-cause" third party, but, as in the case of dischargers, those limitations do not apply when the spill was caused by willful negligence or willful misconduct within the privity or knowledge of the third party.

Subsections (f) and (g) separately affect, then, three discernible categories of dischargers:

1. One whose fault is the sole cause of the discharge, and who will be liable up to the limitations enumerated in Subsections (f) and (g).

of the foregoing clauses, such owner or operator of any such facility from which oil or a hazardous substance is discharged in violation of subsection (b)(3) of this section shall, notwithstanding any other provision of law, be liable to the United States Government for the actual costs incurred under subsection (c) of this section for the removal of such oil or substance by the United States Government in an amount not to exceed $50,000,000, except that where the United States can show that such discharge was the result of willful negligence or willful misconduct within the privity and knowledge of the owner, such owner or operator shall be liable to the United States Government for the full amount of such costs. The United States may bring an action against the owner or operator of such a facility in any court of competent jurisdiction to recover such costs.

(4) The costs of removal of oil or a hazardous substance for which the owner or operator of a vessel or onshore or offshore facility is liable under subsection (f) of this section shall include any costs or expenses incurred by the Federal Government or any State government in the restoration or replacement of natural resources damaged or destroyed as a result of a discharge of oil or a hazardous substance in violation of subsection (b) of this section.

(5) The President, or the authorized representative of any State, shall act on behalf of the public as trustee of the natural resources to recover for the costs of replacing or restoring such resources. Sums recovered shall be used to restore, rehabilitate, or acquire the equivalent of such natural resources by the appropriate agencies of the Federal Government, or the State government.";

3. Report of the Senate Committee on Public Works, S.Rpt. 91–351, August 7, 1969 at page 6, where the Committee observed:

Finally, the committee considered the question of a discharge which occurred solely due to an act of a third party. Among such acts would be a discharge caused when a vessel collided with another vessel which was secured to a dock.

The committee determined that while the owner or operator should not be liable if he could prove that a discharge was caused by one of these acts, it was also necessary that such exemptions be allowed only when the owner or operator proved the discharge to be solely the result of one of the exceptions. Any culpability on the part of the owner or operator would vitiate the exception.

S. 7 was the Senate ancestor of the Senate-House Conference Committee version of the 1970 F.W.P.C.A., and the subject provisions had their genesis in that bill.

2. One who, because of "willfulness" loses the limitation benefits—that is, those limitations will be broken if the Government proves that the discharge was caused by willful negligence or willful misconduct within the privity or knowledge of the owner.

3. Sole cause third-party liability can be substituted for a discharger's liability, but such "third party cause" must be the sole cause of the discharge. Otherwise, the discharger will be responsible as specified in the statute when its fault—no matter how slight—is a causative element of the discharge, and even though it may operate in conjunction with great third-party fault.

There remains, however, yet another category of persons whose liability is not dealt with or affected by the statute—that is, persons who are not Subsection (f) "dischargers", and who are not Subsection (g) "sole cause" third-parties whose actions subject them to Subsection (f) discharger liability by virtue of the "substitution of liability" provisions contained in Subsection (g). In effect, this category is comprised of those who are not:

*dischargers*—for, if they were, they would be subject to Subsection (f), and the attendant liabilities and limitations;

nor are they:

*sole cause third-parties*—for, if they were, they would be within the provisions of Subsection (g), and its attendant liabilities and limitations.

This remaining category includes persons who in some manner caused or contributed to the discharge, but were neither the *source* of the discharge (i. e., not a discharging vessel, onshore or offshore facility) nor the sole other cause of the discharge.

They are those persons whose actions may in any way have caused or contributed to the discharge, and they comprise the category whose liabilities:

1. Are not affected by the liabilities and limitations of Subsections (f) and/or (g), *but,*

2. Are preserved, pursuant to Subsection (h).

### IV. Subsection (h)

Subsection (h) provides:

(h) The liabilities established by this section shall in no way affect any rights which (1) the owner or operator of a vessel or of an onshore facility or an offshore facility may have against any third party whose acts may in any way have caused or contributed to such discharge, or (2) the United States Government may have against any third party whose actions may in any way have caused or contributed to the discharge of oil or hazardous substance.

Courts have held that Subpart (1), *supra,* preserves the right of contribution in favor of a discharger against a third party whose fault contributed to the discharge. (*See, e. g., Valley Towing Service, Inc. v. S. S. Wheat,* Civ. No. 75–363 (E.D.La. Dec. 19, 1978)).

■ This is clearly so, and is supported by both the clear language of the statute, and its legislative history.

■ Unfortunately, there is a dearth of legislative history as to Subpart (2). And, yet, as this Court has already observed, it "has got to mean something". It is the obligation of this Court to give meaning to each and every portion of a legislative act.

A careful reading of the legislative history applicable to the statute and the clear language of the statute itself compels the conclusion that Congress, in drafting Subsections (f) and (g), did not speak to any issue or setting other than the liabilities and relationships between the Government, on the one hand, and a discharger, or its "sole cause third party" substituted surrogate, on the other. There is nothing in either the statute or the legislative history of the Act to support the contention that the benefits of Subsection (h)(2) should be denied to the Government.[4]

---

4. The statute refers, in the applicable subsections (f) and (g), to the liabilities of owners and

operators "to the United States Government." (*See also* Conference Report No. 91–940 (to

To the contrary, the legislative history explicitly states that the Government's "rights over" against third parties are not intended to be affected by the Act.

The availability of a maritime tort remedy to the United States is accepted as established law. *See* Gilmore & Black, 2nd Ed. at 829. While it is this Court's view that such a remedy has been, and remains, available, any doubt is removed by virtue of the F.W.P.C.A. itself.

■ It is the law of this Circuit that admiralty jurisdiction does not arise from the bare fact that an act or injury occurred on navigable waters. Although such facts point towards maritime jurisdiction, the courts are obliged to consider all the pertinent circumstances in determining whether a substantial maritime relationship exists. *See Kelly v. Smith*, 485 F.2d 520 (5th Cir. 1973), which states that, in considering the circumstances which define a maritime relationship, we must consider: the functions and roles of the parties; the types of vehicles and instrumentalities involved; the causation and type of injury; and traditional concepts of the role of admiralty law. *Kelly, supra* at 525.

■ Taking as true the facts pleaded in the complaint, as we must in testing the merits of this motion to dismiss, we note that the act involved occurred on the Mississippi River, a navigable waterway of the United States. An inland oil barge broke away from the tug "Francis Twitty" after a "doubling up" operation, and struck a dolphin owned by defendant IMTT. A barge and a dolphin, as presented in the government's claim, are certainly maritime instrumentalities. The functions and roles of the parties are clearly maritime in nature, as are the causation and type of injury. Finally, traditional concepts of the role of admiralty law would indicate that jurisdiction exists.

Accordingly, maritime jurisdiction is established.

■ Of course, judicial power can afford no remedy unless a right which is subject to that power is present. *State of Maryland Department of Natural Resources v. Amerada Hess Corp.*, D.C., 350 F.Supp. 1060. In *Maryland*, it was the defendants' claim that the State, as a mere trustee of its waters, had no such interest therein as to enable it to bring a "common law" civil suit to redress a wrong done to the waters of the State, absent specific legislation authorizing it to do so. The Court refused such a narrow construction, stating:

> In view of this Court, the State's options in protecting a valuable natural resource cannot be so narrowly circumscribed. The Court has not been directed to and indeed is unaware of any rule of law which holds that the power of a state to legislate concerning a given matter precludes the state from bringing a common law suit to accomplish the same purpose and to redress the same wrong which a statute might seek to correct. This result would violate common sense; for if a state in order to best serve the public interest has the power to legislate regarding a given subject matter, does it not follow that the state also has the inherent power to protect the public welfare by bringing common law suits which seek to attain the same result as that which legislation would seek to accomplish? . . . .

*Maryland, supra* at 1066–1067.

■ The discharge of oil into navigable waters is a maritime tort (*Maryland, supra; State, Department of Fish and Game v. SS Bournemouth*, 307 F.Supp. 922, 929 (U.S. D.C., C.D.Cal.1969). This Court sees no reason to exclude the United States Govern-

accompany H.R. 4148), discussing subsections (f) and (g), U.S.Code Congressional and Administrative News, 91st Congress, Second Session, 1970, Vol. 2, 2691 at page 2724). Indeed, the Conference Report, in discussing subsection (h) declares that:

> Subsection (h) provides that the liability established by this section will not affect any

rights which the owner or operator of the vessel or onshore or offshore facility may have against third parties whose acts in any way may have caused or contributed to the discharge of oil, *or which the United States may have against any such party.*

(Emphasis added). Conference Report, *supra*, at 2726.

ment from the scope of these decisions. Certainly, any doubt as to a lack of standing or interest on the part of the United States to claim a maritime tort remedy has been removed by virtue of the clear language of the F.W.P.C.A. itself. The statute declares it is the policy of the United States that "there should be no discharges of oil ... into or upon the navigable waters of the United States" (33 U.S.C. § 1321(b)(1)); prohibits "the discharge" of oil ... into or upon the navigable waters of the United States" (33 U.S.C. § 1321(b)(3)) and authorizes the President to "act to remove or arrange for the removal of such oil or substance at any time ..." (33 U.S.C. § 1321(c)(1)). An offense against these critical national interests and policies creates a correlative right on the part of the United States to be made whole. That the Congress has determined to impose strict liability, within declared limits, as to those entities from which a discharge of oil occurs, cannot be deemed an intent to abandon any other rights the Government may have against parties who do not fall within the statute's protective ambit.

 The right to seek recovery of oil spill clean-up costs utilizing fault-based maritime tort doctrines against non-discharging, non-sole cause third parties "whose actions may, in any way, have caused or contributed to the discharge of oil ..." is, by the clear language of Subsection (h), in no way affected. The burden of proof would be ordinary negligence, as in the case of any other maritime tort, and claims are subject to the same defenses and limitations.

This Court believes that the discharge of oil into the navigable waters of the United States is a maritime tort, and, even without the now-repealed authority of the Oil Pollution Act of 1924, general maritime law provides the United States with a right to recover oil spill clean-up costs. That this right under general maritime law is elimi-

nated as to "dischargers" and "sole cause third party dischargers" by Subsections (f) and (g), respectively, does not eliminate such rights against certain third parties whose actions are outside the scope of the Act's liabilities and benefits.[5]

 For reasons heretofore stated, this Court finds no F.W.P.C.A. "repeal by implication" of any remedies previously available to the United States, as to non-discharging, non-sole cause third parties, since the Act does not address their liabilities. As to them, the judicial remedies otherwise available are not inconsistent with the statute, and we therefore find no conflict between this decision and *Steuart Transp. Co. v. Allied Towing Corp.*, 596 F.2d 609 (4th Cir. 1979), which involved discharges which were clearly subject to the provisions of Subsection (f). Nor is there any conflict with *Dixie Carriers, Inc.*, 627 F.2d 736 (5th Cir. 1980), which, again, dealt with discharger liability. The defendants in both *Steuart* and *Dixie Carriers* were within the protective scope of Subsection (f). IMTT, because it is outside the protection applied dischargers, or sole-cause third parties, cannot claim the limitations of liability set forth in the Act.

 The mere fact that Congress creates a new cause of action creates no presumption of the non-existence of similar rights at common law—or, as here in the maritime law. *SS Bournemouth, supra.*

 Specifically, to the extent a Subsection (f) discharging party's liability or the "substituted" liability of a Subsection (g) non-discharging party is not adequate to completely reimburse the Government for clean-up costs, the Government is not, by virtue of the Act, precluded from exerting and pursuing a claim in maritime tort against a third-party who does not fit either category. It possesses, and the statute reserves to it, of necessity, the right to claim such excess, just as the statute reserves to one compelled to pay clean-up costs pursu-

---

5. There is precedent for this concept. For example, "The Longshoremen's and Harbor Workers' Compensation Act", 33 U.S.C. § 901 *et seq.*, furnishes the injured employee a "liabil-ity without fault but limited recovery" remedy against his employer (33 U.S.C. § 904), but permits a fault-based claim against a third party (33 U.S.C. § 905(b)).

ant to Subsection (f) the right to seek contribution from a third-party to the extent that the statute imposes Subsection (f) liability upon such discharger, or its substituted third-party surrogate pursuant to Subsection (g). "Trade-off" or "compromise" as it would affect non-sole cause third-parties was never discussed by either the House, Senate or the Conference Committee. Therefore, this Court is required to give Subsection (h) the meaning that a normal reading of that subsection mandates.

## V.

It is important to understand that when the F.W.P.C.A. was enacted it was believed that the limitations imposed were adequate to reimburse the Government for expected expenditures believed to be required, and that Congress would, from time to time, review those limitations and adjust them should changing circumstances require such adjustment. However, the legislative history reflects that the Congress did perceive that there could be instances when the limits of liability would not be adequate.[6] Thus, while Congress in 1977 did amend and raise the limitations set forth in the 1970 Act, there is nothing in the legislative history, either in 1970 or during the course of the 1977 Amendments, which indicates that the basic Congressional concept of "strict liability with limits" as to a discharger or its surrogate was to be the exclusive remedy afforded to the Government. Therefore, while it may be concluded that Congress did not expect Subsection (h) to become an everyday weapon in the nation's anti-pollution arsenal, there is evidence that Congress realized the then-believed rare possibility of excess costs could be recovered, and reserved the public's rights to recover such excess costs by virtue of the "savings" provision of Subsection (h).

This Court therefore holds that the Government may pursue non-discharging, non-sole-cause "third-parties" under usual maritime tort doctrines, to recover oil spill clean-up costs in excess of limits of liability, if applicable, as set forth in the statute. Of course, in any such effort, the Government must prove fault, since no strict liability standards apply. Further, any liability therefrom resulting will be subject to the provisions of the Limitation of Liability Act and other appropriate and applicable maritime tort doctrines.

Thus, in a classic oil spill situation where the discharging vessel's liability is less than the cost of removal, and the spill is the result of joint fault of the discharging vessel and a third-party:

(1) The Government is entitled to recover the limits of the applicable statutory limits from the discharger;

(2) The discharger may recover from the joint fault third-party the amount it may be required to pay, subject to the appropriate comparative negligence offset; and,

(3) The Government, under maritime tort doctrines, may recover from the joint fault third-party its proportionate part of any excess removal costs, subject to the provisions of the Limitation of Liability Act, to the extent of such third-party's fault.

We believe the foregoing properly states the general principles found in the statute and comprises the reasonable and proper interpretation of Congressional will.

The Motion to Dismiss is DENIED.

Judgment will be entered accordingly.

**6.** Senator Muskie, in explaining to the Senate the Conference Report on H.R. 3199, (the Clean Water Act of 1977), which further amended the F.W.P.C.A. by increasing liability limits on oil spills for vessels, observed that:

> The bill also removes the total dollar ceiling on liability for oil spills from vessels except for inland oil barges. The ceiling served no useful purpose, inadvertently subsidizing large tankers and thus enhancing their competitive position over smaller vessels. According to testimony, the $150 per-ton limit should be adequate for cleanup of all but the most catastrophic spills. The $14 million limit in existing law is totally inadequate to deal with an oil spill of any magnitude from the size of tanker that is expected to be plying the waters of the United States.

Congressional Record, Senate, Dec. 15, 1977, at pages S19651.